Receipt number 9998-5552136

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### BID PROTEST

|  |  |
|---|---|
| **DYNCORP INTERNATIONAL LLC,** | ) |
| | ) |
| Plaintiff, | ) |
| v. | )    No.____19-1133 C____ |
| | ) |
| **UNITED STATES OF AMERICA,** | )    ████████████ |
| | ) |
| Defendant. | ) |

### COMPLAINT

DynCorp International LLC ("DI"), by and through its undersigned counsel, submits the following complaint for declaratory and injunctive relief.

### NATURE OF THE ACTION

1.     This action arises out of a determination by the U.S. Department of the Army ("Army" or "Agency") to make Indefinite Delivery, Indefinite Quantity ("IDIQ") contract awards to Kellogg, Brown & Root Services, Inc. ("KBR") of Houston, Texas; Vectrus Systems Corporation ("Vectrus"), of Colorado Springs, Colorado; Fluor Intercontinental, Inc. ("Fluor") of Greenville, South Carolina, and PAE-Parsons Global Logistics Services ("P2GLS") of Arlington, Virginia (collectively, the "Awardees"), in connection with the Army's logistics civil augmentation program ("LOGCAP V") under Solicitation Number W52P1J-16-R-0001 (the "RFP"), pursuant to the procedures of FAR Part 15.

2.     DI is an incumbent contractor for the work contemplated under LOGCAP V. Since 2009, DI has served the Army by providing a broad range of support services under the LOGCAP IV Contract in Afghanistan as well as in the Northern Command ("NORTHCOM") and Pacific Command ("PACOM") — three of the geographical regions awarded under LOGCAP V. The

services DI currently provides include: (1) supply operations, such as the delivery of food, water, fuel, spare parts, and other items; (2) field operations, such as dining and laundry facilities, housing, sanitation, waste management, postal services, and morale, welfare and recreation activities; and (3) other operations, including engineering and construction, support to communication networks, transportation and cargo services, and facilities maintenance and repair.

3.        Under LOGCAP IV, DI was awarded the following LOGCAP IV Task Orders: Task Order 0001 – Project Management Office (PMO); Task Order 0002 – Kuwait Area of Responsibility (AOR); Task Order 0003 – Udairi Airfield Kuwait; Task Order 0004 – Afghanistan Area of Responsibility (AOR); Task Order 0005 – Oman Arrival/Departure Airfield Control Group; Task Order 0006 – Pacific Command (PACOM); Task Order 0007 – North American Command (NORTHCOM).

4.        For its work in these regions, the Army rated DI's past performance positively in all areas, but in particular as ███████████ for DI's cost control for LOGCAP IV Task Orders 0004, 0006, and 0007, which have near-identical scopes of work as are being sought under the RFP for Afghanistan, PACOM and NORTHCOM.

5.        This bid protest is the result of the Army's violation of law and undeniably arbitrary and capricious action and irrational disparate treatment of DI throughout this solicitation, all of which substantially prejudiced DI and ensured DI would not receive one of the IDIQ contracts. As alleged in detail below:

> i.     The Army conducted unequal and misleading discussions;
>
> ii.    The Army failed to conduct a proper cost realism determination;
>
> iii.   The Army's evaluation of KBR's past performance was arbitrary and capricious and contrary to law; and

████████████████████████████████████████

iv.      Based on the foregoing flaws in the Army's evaluation, the Army's Best Value Determination was arbitrary and capricious and contrary to law.

6.      Most significant is the Army's failure to engage in meaningful discussions with DI regarding DI's cost/price proposal and its Labor Staffing Model ("LSM") in violation of FAR 1.602-2 and FAR 15.306(d)(1).  The Army engaged in meaningful discussions with the Awardees and led them through the areas of their proposals that required amplification and correction.  The Army did not, however, similarly lead DI into the areas of its proposal requiring amplification or correction.  As a result, DI was not provided a meaningful opportunity to modify its proposal to address the weaknesses or deficiencies subsequently identified by the Army that had competitive impact on DI's chance of contract award.  *See Precision Asset Mgmt. Corp. v. United States*, 135 Fed. Cl. 342, 355 (2017).

7.      As a direct result of its failure to meaningfully advise DI on the areas of its technical proposal that required amplification or correction (even though it provided such advice to the Awardees), the Army rated DI's technical proposal, including its LSM as merely ███████ – whereas Awardee's KBR, Vectrus, and Fluor received "Outstanding" technical ratings under Factor 1.

8.      Similarly, as a result of the Army's unquestionable failure to advise DI that its price was objectively █████████████████████, the Army deprived DI of the opportunity to modify its price proposal to make it acceptable for award.

9.      As discussed in more detail below, had the Army engaged in meaningful discussions with DI, DI would have ██████████ and adjusted its technical proposal — including its LSM.  Doing so would have resulted in the Army rating DI's technical proposal as

█████████" for Factor 1 — equal to the Army's technical evaluation of P2GLS's technical proposal which received a rating of "Good" for Factor 1 and an award of an IDIQ contract to DI. But DI did not have this opportunity because the Army failed to engage in meaningful discussions with DI, which is *per se* a violation of law.

## JURISDICTION

10.     This Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1), as amended by the Administrative Dispute Resolution Act of 1996.

11.     DI has standing as an "interested party" because it submitted a timely and responsive proposal in response to the RFP and, but for the Army's violation of law and arbitrary and capricious evaluation of the Awardees' proposals in this procurement, DI had a substantial chance of being awarded one of the IDIQ contracts contemplated by the RFP.

12.     If it were not for the Army's violations of law and arbitrary and capricious actions, and had the Army conducted a fair and lawful evaluation of DI and the Awardees' proposals and made a fair and lawful best value determination, DI would have received one of the IDIQ contracts resulting from the RFP.

## PARTIES

13.     Plaintiff, DI, is a Delaware corporation with offices at 1700 Old Meadow Rd, McLean, VA 22102.  Established in 2000, DI provides a broad array of services to U.S. and international customers including for logistics, aviation, training, security, and complete intelligence mission support.  Since 2009, DI has served the Army by providing a broad range of support services under the LOGCAP IV contract in Afghanistan as well as in the Northern Command ("NORTHCOM") and Pacific Command ("PACOM") - three of the geographical regions encompassed under the RFP.

14.     Defendant is the United States of America, acting by and through the Department of the Army, Army Contracting Command-Rock Island, 1 Rock Island Arsenal Rock Island, IL 61299.

## FACTS

### I.     The RFP.

15.     The Army issued the RFP for the fifth iteration of the Army's requirement for LOGCAP services on November 20, 2017 ("LOGCAP V") to obtain a broad range of support services to support and augment the US Army, Joint Forces, and other Department of Defense ("DoD") components, and other select supported agencies.  The LOGCAP V contract is intended to "replace the current LOGCAP IV, Kuwait Base Operations and Security Services [excluding security], and Qatar Base Operations and Security Services Contracts."  AR Tab 3 at 2.[1]

16.     The RFP contemplated a five-year initial ordering period and five one-year options, running from April 12, 2019 through April 11, 2029.  *Id*. at 11.  The IDIQ ceiling value was listed as $82 billion.  *Id*. at 3.

17.     The LOGCAP is designed to service six Army Geographic Combatant Commands ("GCC"), plus Afghanistan – which is broken out separately from the Army's Central Command for purposes of this contract.  *Id*. at 2.  The RFP contemplated a minimum of four (4), and up to six (6), Indefinite Delivery, Indefinite Quantity (IDIQ) contract awards, with contemporaneously issued task orders to address the six GCCs plus Afghanistan.  *Id.* at 11.

---

[1]     All AR cites refer to the record produced in the GAO bid protest which will be produced as part of the Government's Administrative Record.

18.     The seven global commands are: (1) Northern Command (NORTHCOM/ USARNORTH), (2) Southern Command (SOUTHCOM/USARSO), (3) European Command (EUCOM/USAREUR), (4) African Command (AFRICOM/USARAF), (5) Central Command (CENTCOM/USARCENT), (6) Pacific Command (PACOM/USARPAC), and (7) Afghanistan (collectively "global commands" or "GCCs").  *Id.* at 2.

19.     The RFP divided the awards determination into three operational priority groupings as follows:

> Priority Grouping 1: EUCOM (Setting the Theater and associated performance task order) and PACOM (Setting the Theater and associated performance task order). An offeror could only win one of the contracts in this grouping.
>
> Priority Grouping 2: CENTCOM (Setting the Theater and associated performance task orders, except Afghanistan), NORTHCOM (Setting the Theater and associated performance task order), AFRICOM (Setting the Theater and associated performance task order), and SOUTHCOM (Setting the Theater and associated performance task order). An offeror could only win one of the contracts in this grouping.
>
> Priority Grouping 3: Afghanistan (performance task order). To qualify for consideration for Afghanistan, an offeror had to win at least one of the global commands in either of Priority Grouping 1 or 2.

*Id*. at 115-16.

20.     The RFP stated that awards would be made based on a Best Value Tradeoff.  The best value source selection would be based on an integrated assessment of the following four (4) evaluation factors: Technical/Management, Past Performance, Small Business Participation, and Cost/Price, which are listed in descending order of importance: (1) Technical/Management, (2) Past Performance, (3) Small Business Participation, and (4) Cost/Price.  *Id*. at 115.

6

21.     All evaluation factors other than Cost/Price, when combined, were significantly more important than Cost/Price.  *Id.*

## II.     Technical / Management Approach.

### A.     RFP Requirements.

22.     The RFP required each offeror to submit its integrated technical and management approach to accomplish the requirements of the solicitation.  AR Tab 3 at 105.  Offerors were required to complete one copy of the Regional Capability Matrix (Attachment 0021) for each GCC. *Id.* at 106.  A regional capability matrix was not required for Afghanistan.  *Id.* at 106.  For each matrix, the offeror had to describe its structure and experience within each GCC to include, but not limited to: existing locations and capabilities; established business arrangements with host countries; strategic partnerships, vendor networks, and supply chains; transportation networks; and anything else that demonstrates its rapid responsiveness, capabilities, and/or experience throughout the GCC.  *Id.*

23.     For Management Approach, the RFP required each Offeror to provide one (1) overarching management approach applicable to all GCCs and Afghanistan.  *Id.*  The Offeror was required to describe its organizational structure, to include any teaming arrangements and plan to manage the complexity of providing services required by the LOGCAP Standardized PWS paragraph 02.02 Management Support – Post Activation, during start-up operations, managing service adjustments (*i.e.,* adding/removing services, adding/removing workload), and termination of operations.  *Id.*  Offerors were required to describe any tools, reports, communications, or other unique approaches to overcome any challenges in meeting the LOGCAP objectives.  Additionally, each Offeror was required to describe how it would collect, package, and deliver the aforementioned to the Government.  *Id.*

24.     Each Offeror also had to provide a LSM and Approach. *Id.* at 107. The base LSM had to be consistent, scalable, and adjustable in order to account for all activated service requirements identified through the RFP, the PWS, and the associated technical exhibits, including the government provided workload inputs and assumption criteria identified in Attachments 0002 thru 0010. The LSM was required to predict the labor staffing mix (supervision, skilled trade, laborer, etc.), types (job description, labor category, etc.), and quantities. Labor quantities were required to be provided as productive labor hours. Non-productive labor hours were not allowed to be included in the LSM. The resulting labor categories within the LSM were required to be clearly assigned a unique identifier correlating the position to the appropriate description in the Offerors Attachment 0023 Labor Job Descriptions, referenced in paragraph L.7.1.(2) of the RFP. *Id.* Using the base LSM above, each Offeror was required to develop and provide one (1) Labor Staffing Approach for each of the RFP's described task orders. The Labor Staffing Approach for each task order was required to be produced by populating the base LSM with the unique requirements in the Government provided workload data and assumptions identified in Attachments 0002 thru 0010, respectively. *Id.* at 107.

25.     To explain the LSM and Approach, the RFP required offerors to produce a Labor Staffing Model Supporting Rationale (the "Rationale"). *Id.* at 107-08. In the Rationale, each offeror had to describe the supporting rationale it used as the basis for its base LSM development for all activated services identified through the RFP, the PWS, and the associated technical exhibits, including the government provided workload inputs and assumption criteria identified in Attachments 0002 thru 0010. *Id.* The descriptions in the Rationale had to explain how the Offeror determined the types and quantities proposed for a particular resource and could not be so general that it was not possible to determine how the proposed types or quantities were developed. The

8

RFP required offerors to identify the source data, formulas, or calculations used to estimate the proposed quantities, to include, Offeror's basis, support, estimating relationships, or estimating methodologies such as:

1. If a resource was based on an analogous relationship, explain how relationship was determined and show how it was used to develop the type or quantity. Explain what adjustments, if any, were made to the relationship, and why the adjustment was made. Show how this was used to calculate the quantity.

2. If a resource was based on past experience (historical performance/time study/standard operating procedures), explain what the past experience was, how many people or units were used, and how the level of effort is relevant to the current proposal. Explain what adjustments, if any, were made to develop the proposed quantity or hours, and why the adjustment was made. Show how this was used to calculate the quantity.

3. If a resource was based on a minimum manning standard or regulation, identify the source, and explain how the level of effort is relevant to the current proposal. Explain what adjustments, if any, were made to develop the proposed quantity or hours, and why the adjustment was made. Show how this was used to calculate the quantity. The above list is not all inclusive. The Offerors description should provide all information appropriate to facilitate the Governments understanding of the supporting rationale and basis for the Labor Staffing Model.

*Id.*

26.     In addition to submitting a written proposal, the RFP invited offerors to present their proposed LSM and Approach to demonstrate the functionality and operation of the LSM. Further, the Offeror was required to demonstrate the navigation between the various sections (workbooks, files, tabs, etc.) of the Offeror's LSM and Approach. *Id.* at 108.

**B.      Evaluation Criteria.**

27.     For the evaluation of the technical approach, the RFP stated that the Technical/Management proposal would be evaluated on the feasibility of its technical/management approach to accomplishing the requirements of the solicitation. *Id.* at 117.

The RFP provided that a separate adjectival rating would be assigned to support award determinations for each GCC and Afghanistan that considered the impact of the Offeror's approach on the following LOGCAP risk areas:

- Responsiveness: Ability to provide sustainment for an agile force where and when needed.

- Affordability: Ability to employ effective measures to control costs and ensure best value.

- Transparency: Ability to ensure that costs can be traceable to execution.

- Predictability: Confidence in cost estimates when levels of effort are known.

- Capability: Ability to reliably provide the full spectrum of sustainment services across the full range of possible mission sets.

- Accountability: Ability to adhere and comply with regulatory and contractual requirements.

- Flexibility: Ability to rapidly expand or reduce resources to meet commander's objectives.

*Id.*

28.    The Army was required to consider each Offeror's experience and capabilities within each global command as demonstrated in its Regional Capability Matrix (Attachment 0021), as well as the Offeror's description of its structure within each region to include, but not limited to: internal locations and capabilities; established business arrangements with host countries; strategic partnerships, vendor networks, supply chains; and anything else that demonstrates its rapid responsiveness, flexibility, capabilities, and/or experience throughout the global command.  The RFP placed an emphasis on the Offeror's ability to demonstrate how it will leverage the aforementioned experience and capabilities to deliver PWS 02.01 Setting and Surging

the Theater (Phases 0-II) and other key sustainment activities in support of the Army deployment

process. *Id.*

29.     With regard to the LSM and Approach, the Army was required to evaluate the

feasibility and confidence in the Offeror's LSM and Approach to predict labor staffing mix, types,

and quantities (troop to task) to meet the activated service requirements identified through the RFP,

the PWS, and the associated technical exhibits, including the government provided workload

inputs and assumption criteria identified in Attachments 0002 thru 0010, respectively.  The model

was to be evaluated for consistency, scalability, and adjustability across the aforementioned broad

range of requirements.  The confidence evaluation was required to consider the quality and

soundness of the supporting rationale utilized to develop the LSM and Approach.

30.     The following adjectival definitions were applicable:

| | |
|---|---|
| Outstanding | Proposal indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low. |
| Good | Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength, and risk of unsuccessful performance is low to moderate. |
| Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate. |
| Marginal | Proposal has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high. |
| Unacceptable | Proposal does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance is unacceptable. Proposal is unawardable. |

*Id.* at 119.

31.     The following risk descriptions were applicable to the determination of the

adjectival ratings:

| Low | Proposal may contain weakness(es) which have little potential to cause disruption of schedule, increased cost or degradation of performance. Normal contractor effort and normal Government monitoring will likely be able to overcome any difficulties. |
| Medium | Proposal contains a significant weakness or combination of weaknesses which may potentially cause disruption of schedule, increased cost or degradation of performance. Special contractor emphasis and close Government monitoring will likely be able to overcome difficulties. |
| High | Proposal contains a significant weakness or combination of weaknesses which is likely to cause significant disruption of schedule, increased cost or degradation of performance. Is unlikely to overcome any difficulties, even with special contractor emphasis and close Government monitoring. |
| Unacceptable | Proposal contains a material failure or a combination of significant weaknesses that increases the risk of unsuccessful performance to an unacceptable level. |

*Id.*

### III.   Past Performance.

32.     The RFP provided that the Army would evaluate past performance as a predictor of future contract performance and the degree of confidence the Agency has that the Offeror will successfully complete the solicitation requirements in accordance with the contract terms based on the Offeror's demonstrated record of relevant past and current performance. *Id.* at 118.

33.     The RFP required each offeror to submit with its initial proposal up to four (4) project/contract references based on its own performance and up to two (2) project/contract references for its proposed major subcontractor(s), and up to two (2) project/contract references for up to two (2) subcontractor(s) it determines critical to its approach. *Id.* at 109. As to relevant past performance, the RFP defined recent contracts as contracts (excludes basic IDIQ where performance occurs on task/delivery order), task orders, delivery orders, or subcontracts where services and/or deliverables were performed, or still being performed, anytime within three (3)

years of issuance of this Request for Proposal (RFP), regardless of award date. The Government reserved the right to consider any significant past performance after the solicitation closing date and prior to award.

34.     Relevant contracts were defined as follows:

a.     Very Relevant Present/Past Performance effort involved similar scope, valued at $50 million or more per annum, and with performance at three (3) or more separate and distinct sites.

b.     Relevant - Present/Past Performance effort involved similar scope, a value of at least $20 million per annum and with performance at two (2) or more separate and distinct sites.

c.     Somewhat Relevant - Present/Past Performance effort involved some of the scope and a value of at least $5 million per annum.

d.     Not Relevant - Present/Past Performance effort involved little or none of the scope or is valued at less than $5 million per annum.

*Id.* at 109.

35.     The RFP also required offerors to address adverse past contract performance. *Id.* at 110. Specifically, the RFP required each Offeror, to include individual JV partners, to identify every recent and relevant contract the Offeror was awarded where that Offeror experienced any performance problems meeting the following parameters: termination in whole or in part; receipt of a Level III or IV Corrective Action Report (CAR), Non-Conformance Report (NCR) or equivalent document; show-cause letter; or cure notice. *Id.* For any contract falling under these descriptions, the offeror had to provide a copy of any relevant documents referenced by the RFP; identify reason for any termination; state any corrective actions taken to avoid recurrence; and describe the extent to which the corrective action has been successful, identifying points of contact who can confirm the success of the corrective measures. *Id.*

36. With respect to sexual assault and sexual harassment, the RFP incorporates Performance Work Statement ("PWS") Section 04.07.01 Clinical Governance and Credentialing, which provides, in pertinent part, the following two requirements:

> The contractor shall comply with current Army and OTSG/MEDCOM Policy for Reporting Incidents of Sexual Assault and Sexual Harassment under the Sexual Assault Prevention and Response Program (SHARP).
>
> …
>
> In accordance with current OTSG/MEDCOM Policy regarding contractor personnel with knowledge of an incident of sexual assault occurring on a Government facility, to include a Government leased facility, where the contractor is providing services under this contract, will immediately report the incident to the contractor MHSM, and the contractor MHSM will immediately report the incident to the government's contracting officer's representative, who will in turn report the incident to the base/camp Sexual Assault Response Coordinator (SARC).
>
> AQL: The contractor MHSM will notify the COR no later than 24 hours after learning of the incident.

37. Past performance information was to be evaluated as a predictor of future contract performance. The Army was required to assess the degree of confidence it had that the Offeror will successfully complete the requirements in accordance with the contract terms based on the Offeror's demonstrated record of recent and relevant performance as defined in L.8.3 and L.8.4. *Id*. at 118.

38. In conducting the past performance evaluation, the Government was permitted to use information provided by the Offeror in its proposal as well as data obtained from other sources or other information with regard to other contracts performed by the Offeror of which it has knowledge, whether or not those contracts are disclosed to the Government by the Offeror. *Id*

39. The Government could consider the currency, degree of relevance, and context of the Past Performance information it evaluated, as well as general trends of performance and

demonstrated corrective actions.  The RFP expressly stated that a "problem/problem resolution or lack of relevant data in any element can become an important consideration in the assessment process."  *Id*. at 119.  Moreover, "[a] negative finding in any element may result in an overall lower confidence assessment rating."  *Id*. (emphasis added).

40.    The following adjectival ratings were applicable to the past performance evaluation:

| Substantial Confidence | Based on the Offerors recent/relevant performance record, the Government has a high expectation that the Offeror will successfully perform the required effort. |
|---|---|
| Satisfactory Confidence | Based on the Offerors recent/relevant performance record, the Government has a reasonable expectation that the Offeror will successfully perform the required effort. |
| Neutral Confidence | Based on the Offerors recent/relevant performance record, the Government has a reasonable expectation that the Offeror will successfully perform the required effort. |
| Limited Confidence | Based on the Offerors recent/relevant performance record, the Government has a low expectation that the Offeror will successfully perform the required effort. |
| No Confidence | Based on the Offerors recent/relevant performance record, the Government has no expectation that the Offeror will be able to successfully perform the required effort. |

## IV.    Price.

41.    The RFP required offerors to submit separate cost/price proposals for each of the RFP's task orders for the respective global commands (EUCOM, PACOM, CENTCOM, NORTHCOM, AFRICOM, SOUTHCOM, and Afghanistan).  RFP at 112-113.  In addition, the RFP required a completed copy of Attachment 0017 – the FFP Pricing Template, where offerors were required to break out their pricing by period and by global command.  *Id*. at 113.  Further,

15

offerors had to provide a narrative that identified all assumptions applicable to the proposed pricing. *Id*.

42.     For the price evaluation, the RFP required: "The Government [to] evaluate the realism of the offerors proposed cost for the cost reimbursable effort through cost realism analysis IAW FAR 15.404-1(d).  The Government will evaluate price reasonableness for the fixed priced effort IAW FAR 15.404-1(b)."  *Id*. at 120.

43.     For the Cost/Price CLINs, the RFP required as follows:

> "The Offerors proposed costs will be evaluated for reasonableness and realism. (a) Cost/Price analysis, along with technical analysis techniques, will be used to determine price reasonableness, and to perform cost realism to determine if the costs in an Offerors proposal are realistic for the work to be performed. (b) The cost proposal will be evaluated to determine whether the estimated proposed cost elements are realistic for the work to be performed; the proposal reflects an understanding of the solicitation requirements; and whether the cost proposal is consistent with the unique methods of performance described in the Offerors Technical/Management proposal. (c) The methods of evaluation noted above may include the use of information from sources such as (but not limited to) the Defense Contract Audit Agency (DCAA) and the Defense Contract Management Agency (DCMA)."

*Id*. at 120-21.

44.     For the Fixed Price CLINS, the RFQ required: "The Offerors proposed price will be evaluated for reasonableness using price analysis techniques." *Id*. at 121.

45.     The RFP stated that a total evaluated price would be determined for each GCC and Afghanistan award determinations for the award of the IDIQ contracts and related task orders.  The Agency would determine the total evaluated price for the IDIQ award determinations by adding together the offeror's proposed cost plus fixed fee for the cost reimbursable efforts, any cost adjustments necessary based upon the cost realism analysis, and

Case 1:19-cv-01133-LAS   Document 59   Filed 08/16/19   Page 17 of 58

Case 1:19-cv-01133-LAS   Document 1 ▇▇▇▇▇   Filed 08/05/19   Page 17 of 53

the offeror's proposed price for the firm fixed priced effort for each task order.  The transition period, base year, and all option years, to include the FAR 52.217-8 Option to Extend Services period, shall be included in the cost/price calculations.  *Id.*

46.     The Army was to calculate a total evaluated price ("TEP") for each global command by adding together the following, as applicable:

(a)     Grand Total Price Summary for the applicable task order(s). This includes the Transition and FOC grand total price for all periods (Base through Option Year 4 and the FAR 52.217-8 Option to Extend Services period).

(b)     Any Most Probable Cost (MPC) adjustments to the amount shown in the Grand Total Price row of the Grand Total Cost Plus Fixed Fee Table of the Grand Total Price Summary. In the event of an MPC adjustment, the Government will use the Offerors proposed fee rate in determining the total evaluated price.

(c)     The Grand Total Price shown in the FFP Pricing Template for all periods (base period, all option years, and the FAR 52.217-8 Option to Extend Services period) for the applicable task order. The above includes the option pricing for additional quantities for PWS paragraphs 02.01.01 through 02.01.03.

*Id.*

47.     In general, offerors' cost/price proposals had to address the following FFP and CPFF elements:

| Element | EUCOM | PACOM | CENTCOM | NORTHCOM | AFRICOM | SOUTHCOM | Afghanistan |
|---|---|---|---|---|---|---|---|
| FFP Setting in Theater | FFP | FFP | FFP | FFP | FFP | FFP | N/A |
| Transition | Gov't Plug Number | Gov't Plug Number | Gov't Plug Number | Gov't Plug Number | Gov't Plug Number | Gov't Plug Number | Gov't Plug Number |
| Direct Labor | X | X | X | X | X | X | X |
| Subcontracts | X | X | X | X | X | X | X |

| Element | EUCOM | PACOM | CENTCOM | NORTHCOM | AFRICOM | SOUTHCOM | Afghanistan |
|---|---|---|---|---|---|---|---|
| Materials | Gov't Plug Number | Gov't Plug Number | Gov't Plug Number | Gov't Plug Number | Gov't Plug Number | Gov't Plug Number | Gov't Plug Number |
| Equipment | Gov't Plug Number | Gov't Plug Number | Gov't Plug Number | Gov't Plug Number | Gov't Plug Number | Gov't Plug Number | Gov't Plug Number |
| Intra-Theater Air Travel | Gov't Plug Number | Gov't Plug Number | Gov't Plug Number | N/A | Gov't Plug Number | Gov't Plug Number | Gov't Plug Number |
| ODCs | X | X | X | X | X | X | X |
| Direct Labor Overhead | X | X | X | X | X | X | X |
| Indirect Costs | X | X | X | X | X | X | X |
| G&A | X | X | X | X | X | X | X |

48.     The "X's" in the table above identify a cost element of Offerors' proposals that would be evaluated for cost realism when the "Setting the Theater's" firm fixed price was to be evaluated for price reasonableness.  As indicted above, the RFP provided "plug numbers" that all offerors had to use as part of their cost proposals.  In addition, and as part of Amendment 9 to the RFP, the Army provided updated Attachments 0002-0010, which are Excel files, including an additional/updated assumption: "Assumptions for annual manhours hours required to complete preventive maintenance on systems identified in the PWS paragraph 06.01.01."  The Amendment also set the annual manhours for the maintenance of identified and listed equipment.  *See* RFP Amend. 9, Attachment 0002 through 0010.  Attachments 0002 through 0010 identified the areas subject to the preventive maintenance assumption as follows:

| Amendment 9 Attachment | Site |
|---|---|
| 0002 | CENTCOM, All Kuwait Sites |
| 0003 | All AP Sites |
| 0004 | CENTCOM, All Iraq Sites |
| 0005 | EUCOM, All EUCOM Sites |
| 0006 | PACOM, All Kwajalein Sites |
| 0007 | NORTHCOM, All NTC Sites |
| 0008 | AFRICOM, All AFRICOM Sites |
| 0009 | SOUTHCOM, All Soto Cano Sites |
| 0010 | Afghanistan, All Afg Sites |

AR Tab 12.

**V.   Proposal Submission.**

49.   DI timely submitted its compliant and responsive Final Proposal Revision on February 5, 2019. DI's proposal was for an IDIQ contract and the Army's concurrently issued task orders for each of the seven global commands identified in the RFP.

**VI.   Evaluation Results.**

50.   On April 12, 2019, DI received an Unsuccessful Offeror Notice stating that its proposal had not been selected for an IDIQ contract award, and therefore DI did not receive any of the task orders for any of the global commands.

51.   On April 12, 2019, DI also received a copy of the redacted Source Selection Decision Document ("SSDD"). *See* AR Tab 123.

52.   Additionally, on April 16, 2019, DI received written debriefing slides. *See* AR Tab 129.

53.   The Army awarded KBR an IDIQ contract, and then the task orders for EUCOM, NORTHCOM, and Afghanistan.  The Army awarded Vectrus an IDIQ contract, and then the task orders for PACOM and CENTCOM.  The Army awarded Fluor an IDIQ contract, and then the task order for AFRICOM.  Finally, the Army awarded P2GLS an IDIQ contract, and then the task

order for SOUTHCOM.  The Army did not award an IDIQ contract to DI, and therefore DI was

not eligible for any task order award under the LOGCAP V RFP.  The SSDD and debriefing slides

revealed the following non-price adjectival rating for DI's proposal for each of the RFP's regions:

| Evaluation Factor | Adjectival Rating |
|---|---|
| Technical/Management Approach - EUCOM | ██ |
| Technical/Management Approach - PACOM | ██ |
| Technical/Management Approach - CENTCOM | ██ |
| Technical/Management Approach - NORTHCOM | ██ |
| Technical/Management Approach - AFRICOM | ██ |
| Technical/Management Approach - SOUTHCOM | ██ |
| Technical/Management Approach - Afghanistan | ████ |
| Past Performance | ████████ |
| Small Business Participation | ████ |

AR Tab 129 at 18, 23, 26.

54.     The debriefing slides stated that DI met all the requirements for all technical sub-

factors and that the Agency did not identify any weaknesses or deficiencies.  *Id.*

55.     The debriefing slides reveal the Army's process for its flawed best value tradeoff

for each global command and compared DI to each Awardee.  For NORTHCOM, the SSAC

recommended KBR for award because "KBR had the highest rated proposal based on an integrated

assessment of the RFP's stated evaluation criteria."  *Id*.  The SSEB's comparative summary

between DI and KBR, was as follows:

████████████████████████████████████████████

| Factor | DynCorp International, LLC | Kellogg, Brown & Root Services, Inc. |
| --- | --- | --- |
| Technical/Management | ▮▮▮ | Outstanding |
| Past Performance | ▮▮▮▮▮▮ | Substantial Confidence |
| Small Business Participation | ▮▮▮▮ | Outstanding |
| Total Evaluated Price | ▮▮▮▮▮ | $393,988,697.67 |

*See* AR Tab 129 at 32.

     56.     The SSA concurred with the SSAC's recommendation.  AR Tab 123 at 18.  The

SSA explained:



AR Tab 123 at 19.

     57.     For PACOM, the SSAC recommended Vectrus for award because "Vectrus had the

highest rated proposal based on an integrated assessment of the RFP's stated evaluation criteria."

AR Tab 123 at 11.  The SSEB's comparative summary between DI and Vectrus, was as follows:

| Factor | DynCorp International, LLC | Vectrus Systems Corporation |
|---|---|---|
| Technical/Management | ████ | Outstanding |
| Past Performance | ████████████ce | Substantial Confidence |
| Small Business Participation | ████████ | Good |
| Total Evaluated Price | ████████████ | $349,187,574.26 |

AR Tab 129 at 30.

58.     The SSA concurred with the SSAC's recommendation.  AR Tab 123 at 12.  The SSA explained:



AR Tab 123 at 15.

59.     For CENTCOM, the SSAC recommended Vectrus for award because "Vectrus had the highest rated proposal based on an integrated assessment of the RFP's stated evaluation criteria."  AR Tab 123 at 15.  The SSEB's comparative summary between DI and Vectrus, was as follows:

██████████████████████████████████████████████
████████████████████████████████████

| Factor | DynCorp International, LLC | Vectrus Systems Corporation |
|---|---|---|
| Technical/Management | ██ | Outstanding |
| Past Performance | ██████████ | Substantial Confidence |
| Small Business Participation | ██████ | Good |
| Total Evaluated Price | ████████ | $1,033,582,366.80 |

AR Tab 129 at 31.

60.    The SSA concurred with the SSAC's recommendation.  AR Tab 123 at 16.  The SSA explained:



*Id.* at 17.

61.    For EUCOM, the Source Selection Advisory Council ("SSAC") recommended KBR for award because it concluded "KBR had the highest rated proposal based on an integrated

assessment of the RFP's stated evaluation criteria." AR Tab 123 at 7. The Source Selection

Evaluation Board's ("SSEB") comparative summary between DI and KBR, was as follows:

| Factor | DynCorp International, LLC | Kellogg, Brown & Root Services, Inc. |
|---|---|---|
| Technical/Management | ██ | Outstanding |
| Past Performance | ████ ████ | Substantial Confidence |
| Small Business Participation | ████ | Outstanding |
| Total Evaluated Price | ████ | $183,304,831.67 |

AR Tab 129 at 29.

62.     The SSA concurred with the SSAC's recommendation.  AR Tab 123 at 7.  The SSA

explained:



*Id*. at 11.

63.     For AFRICOM, the documents produced by the Army ████████



████████ issued an award decision for Fluor.  AR Tab 123 at 19.  The SSEB's

comparative summary between DI and Fluor, was as follows:

| Factor | DynCorp International, LLC | Fluor Intercontinental, Inc. |
| --- | --- | --- |
| Technical/Management | ▮ | Outstanding |
| Past Performance | ▮ | Satisfactory Confidence |
| Small Business Participation | ▮ | Good |
| Total Evaluated Price | ▮ | $137,222,537.90 |

*See* AR Tab 129 at 33.

64. The SSA explained:



AR Tab 123 at 21.

65.     For SOUTHCOM, the SSAC recommended P2GLS for award because it had a "superior proposal overall given the relative order of importance of factors and was the best value." AR Tab 123 at 22. The SSEB's comparative summary between DI and P2GLS, was as follows:

| Factor | DynCorp International, LLC | PAE-Parsons Global Logistics Services |
| --- | --- | --- |
| Technical/Management | ▮ | Good |
| Past Performance | ▮ | Substantial Confidence |
| Small Business | ▮ | Outstanding |

▮▮▮▮▮▮▮▮▮

| Total Evaluated Price | | $34,596,500.37 |
|---|---|---|

AR Tab 129 at 34.

66. There is no indication in the SSDD that the SSA concurred in this decision, however the following explanation was provided in the SSDD:



AR Tab 123 at 22-23.

67. For Afghanistan, the SSAC determined that "DynCorp and URS were excluded from this decision as ineligible, having not been previously awarded to under Operational Priority Groups 1 or 2. Further, Vectrus was excluded from this award decision, having been previously awarded the third award." AR Tab 123 at 23. Of the remaining offerors, the SSAC recommended KBR for award because "KBR had the highest rated proposal based on an integrated assessment of the RFP's stated evaluation criteria." *Id.* The SSEB's comparative summary between DI and KBR, was as follows:

| Factor | DynCorp International, LLC | Kellogg, Brown & Root Services, Inc. |
|---|---|---|
| Technical/Management | ████████ | Good |
| Past Performance | ████████ | Substantial Confidence |
| Small Business Participation | ████████ | Outstanding |
| Total Evaluated Price | ████████ | $1,372,043,984.72 |

AR Tab 129 at 35.

68.     The SSA concurred with the SSAC's recommendation.  AR Tab 123 at 24.  Based on these evaluation results, the Army did not award DI an IDIQ contract or, as a result, any task order for any GCC or Afghanistan.

69.     DI timely submitted its protest to the GAO (B-417506) on April 22, 2019 challenging the Army's evaluation of DI's and the Awardees' proposals and award determination.

70.     In its original bid protest, DI alleged that the Army's evaluation of proposals was severely flawed and contrary to law.

71.     On June 3, 2019, DI filed a timely supplemental protest at the GAO (B-417506.10) based on new facts learned from the Army's Agency Report.

72.     On June 27, 2019, DI filed timely consolidated comments to the Army's May 22, 2019 Agency Report and June 17, 2019 Supplemental Report and withdrew five protest grounds from its original protest.

73.     On July 31, 2019, the GAO issued a decision denying DI's protest, finding that the "agency's evaluation was reasonable and consistent with the terms of the solicitation and applicable statutes and regulations, and record further demonstrates that the agency's discussions were meaningful and equitable."

## CLAIMS FOR RELIEF

### COUNT I:

### THE ARMY CONDUCTED
### UNEQUAL AND MISLEADING DISCUSSIONS

**(Violation of the Administrative Procedure Act, 5 U.S.C. § 706, Competition in Contracting Act, 41 U.S.C. § 3701(a)) and FAR 1.602-2 and 15.306(d))**

74.     Paragraphs 1 through 73 are incorporated by reference as if set forth herein.

75.     The Administrative Procedure Act ("APA") requires this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

76.     The Competition in Contracting Act ("CICA") requires that "[a]n executive agency shall evaluate sealed bids and competitive quotes, and award a contract, based solely on the factors specified in the solicitation." 41 U.S.C. § 3701(a).

77.     FAR 1.602-2(b) required the Contracting Officer to "[e]nsure that contractors receive impartial, fair, and equitable treatment."

78.     FAR 15.306(d)(1) required that, when conducted, the Army had to conduct discussions with all offerors in the competitive range.

79.     Pursuant to FAR 15.306(d)(2), "[t]he primary objective of discussions is to maximize the Government's ability to obtain best value, based on the requirement and the evaluation factors set forth in the solicitation."

80.     During discussions, FAR 15.306(d)(3) required the Agency to, "at a minimum": "indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond."

81.   In addition, per FAR 15.306(d)(3), "the contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award."

82.   Although FAR 15.306(e)(3) limits the Contracting Officer from "reveal[ing] an offerors price without that offerors' permission[,]" it also expressly states "the contracting officer may inform an offeror that its price is considered by the Government to be too high, or too low, and reveal the results of the analysis supporting that conclusion.   It is also permissible, at the Government's discretion, to indicate to all offerors the cost or price that the Government's price analysis, market research, and other reviews have identified as reasonable."

83.   The Army's failure to provide DI with meaningful and equal discussions is a violation of the APA's, CICA's, the FAR's and the RFQ's requirements.

**A.**   **The Army Failed to Advise DI that Its Price/Cost Proposals Were ███████ and Would Preclude Award to DI in Violation of FAR 15.306(d).**

84.   The Army failed to conduct meaningful discussions with DI because it did not advise DI that its ████████████████████████████████, and therefore deprived DI of a meaningful opportunity to revise its proposals.

85.   FAR 15.306(d) requires, "at a minimum, the contracting officer must … indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond. *Precision Asset Mgmt. Corp.*, 135 Fed. Cl. at 355.

86.   Discussions are meaningful if they generally lead offerors into the areas of their proposals requiring amplification or correction, which means that discussions should be as specific as practical considerations permit.  *Id.*

29

87.     In   submitting   questions   during discussions,   an   agency   is not   permitted to mislead an offeror "into responding in a manner that does not address the agency's concerns; or that misinforms the offeror concerning its proposal weaknesses or deficiencies."

88.     Although FAR 15.306(d)(3) only requires an agency to address "significant" weaknesses and deficiencies, in this procurement, the Army went well beyond the requirements of FAR § 15.306(d)(3), and "engaged in meaningful discussions with DI throughout the evaluation. The Army provided offerors Evaluation Notices for all deficiencies, significant weaknesses, weaknesses, uncertainties, minor/clerical, adverse past performance, and cost/price concerns." AR Tab 1 at 51.

89.     The Army's cost/price discussions with DI were misleading and not meaningful because they did not inform DI of the Army's concerns that DI's cost/price proposal was ████████

90.     The Agency Report at the GAO confirms that the Army was concerned that DI's price was ████████ – yet declined to open discussions with DI to allow it to address the Army's concerns regarding DI's price.

91.     Specifically, the Agency Report included a Memorandum on "DynCorp's Total Proposed Prices" prepared by the Army on December 14, 2018 (the "Memo"), in which the Army discussed its concerns with DI's cost/price proposal, which show the Army found DI's price to be ████████████ AR Tab 331.

92.     In the Memo, the Army set forth its concern that DI's prices were ████████ The Memo shows, for example, that DI's ██████████████████████████████ ████████████████████████████████████████████████████ *Id*.

93.     The Army recognized that ████████████████████████████

████████████████████████████████████████████████

30

████████████████████████████████████████████████
████████████████████████████████████████

Case 1:19-cv-01133-LAS   Document 1 ██████   Filed 08/05/19   Page 31 of 53



*Id.* at 1-2.

94.     Notwithstanding the Army's finding that DI's price was ████████████
████████, the Army irrationally declined to open discussions with DI to address this concern.

95.     █████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
████████████████████████████████████ *Id.*

96.     The CO further stated in the Memo ████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████

97.     The irrationality of the Agency's decision not to open discussion on prices, notwithstanding its recognition that DI's prices were ████████ is exacerbated by the fact that the Army sent DI a total of ██ ENs — ██ of which related to cost/price — over a nine-month period (AR Tab 209 at 8); yet the Army never provided *any* indication to DI that its proposed costs and prices were ██████████████.   Consequently, the Army's discussions with DI were not meaningful, and furthermore were misleading as a result of what was not said.

31

98.     Had the Army advised DI that its pricing was ████████████████████

████████████████████████████████████████████████████████████

████████████

99.     DI was prejudiced because the Army's discussions with DI failed to mention, in

any capacity, that DI's price was ██████, and therefore the Army failed to impart sufficient

information for DI to have a fair and reasonable opportunity to identify and correct its proposal to

address the Army's concerns, and thus the Army's discussions failed to satisfy the FAR 15.306

requirement for meaningful discussions.

   **B.     The Army's Discussions Failed to Disclose the ████████████████**
   **Ascribed to DI's Labor Staffing Model in Violation of FAR 15.306(d) and FAR**
   **1.602-2.**

100.    The Army's discussions did not comply with FAR § 15.306(d) as the Army failed

to identify to DI the Army's overarching concerns regarding DI's LSM.

101.    The Army was required to raise these specific, identified issues with DI to satisfy

the requirement of meaningful discussions, so as to lead DI into "areas of its proposal requiring

amplification or correction such that perceived issues with DI's LSM could "be altered or

explained to enhance materially the proposal's potential for award." FAR 15.306.

102.    The technical/management ENs issued to DI were not meaningful as the ENs did

not disclose the overarching concerns the Army had regarding DI's LSM.

103.    The discussions offered to DI were incomplete, and therefore not meaningful

because the Army's list of concerns raised with DI did not raise the ███████ later identified in

the SSEB Report and SSDD.

104.    Moreover, the Agency Report reveals that the scope and substance of discussions with DI about its LSM were inequitable and unfair when compared to other offerors, in violation of FAR 1.602-2.

105.    As a result of the Army's failure to engage in meaningful discussions with DI that put DI on notice of the Army's true concerns with DI's LSM, DI was unable to address the Agency's concerns.  Had the Army provided notice of these ▮▮▮▮▮▮ to DI; ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**C.      The Army Re-Opened Discussions After Final Proposal Submission Which Permitted The Awardees, but Not DI, to Submit New Proposal Revisions in Violation of FAR 1.602-2 and 15.306.**

106.    Pursuant to FAR 1.602-2 and 15.306, the Army was prohibited from engaging in discussions that favored one offeror over another.  FAR §§ 1.602-2 and 15.306(e).

107.    The Army violated FAR 1.602-2 and 15.306(e) by conducting discussions in which the Army led the Awardees into areas of their proposal that needed clarification or amplification, and permitted the Awardees to submit proposal revisions, but deprived DI of this same opportunity.

108.    On December 21, 2018, at the Army's instruction, all six offerors, DI, URS, KBR, Vectrus, Fluor, and P2GLS submitted FPRs. AR Tab 1 at 30.  After FPR submission, however, the Army ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

109.    On February 1, 2019, the Army reopened discussions with the Awardees and DI. AR Tabs 249-252.

110.    The post-FPR discussions allowed each of the Awardees, but not DI, a meaningful opportunity to revise their proposals.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

111.   In response to these discussions, on February 6, 2019, all awardees submitted proposal revisions. AR Tabs 31, 49, 52-3, 52-4, 71-1, 72-11, 75-1, 78, 170-4, 178-7, 183-9.

112.   Unlike the awardees, DI was not provided any meaningful opportunity to address any of the Agency's concerns with DI's cost/price proposal or LSM, let alone ███████ ███████.

113.   Dissimilar to the Army's discussions with P2GLS, KBR, and Vectrus, the Army did not identify any issues for DI to address in a new, FPR. The Army's discussions with DI that requested DI to address ██████████████ ████ was meaningless.

114.   DI was prejudiced by the Army's failure to engage in similar meaningful discussions as the Army had done with the Awardees in February 2019.

115.   Had DI been informed by the Army during discussions that the Army viewed DI's LSM and supporting rationale and/or DI's cost/price ██████████████ ██████████████.

**D.   The Army Misled DI to ███████████   Through Evaluation Notices That Indicated to DI ███████**

116.   Through discussions, the Army misled DI to ███████
████████████████████████
████████████████████████
███████████████

117.   On May 21, 2018, the Army issued EN Number DYN-CP030-20180801-D Tranche 3 to DI. In that EN, the Agency requested:

██████████████████████████████a

███████████████████████████████



AR Tab 168 at 43.

118.    The Army's EN was misleading.  Indeed, DI's response indicates that it understood the Army to be requesting DI ████████████████████████████████████████ ████

119.    Thus, in response, DI ████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████

120.    Indeed, in  response  to  EN  Number  DYN-CP030-20180801,  DI ████ ████████████████████████████████████████████████████████ ████████████

121.    In addition, in response to another EN from Army, ████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████

122.    Moreover, upon receipt of DI's response to EN Number DYN-CP030-20180801-D Tranche 3, ████████████████████████████████████████████████ ████████████████████  To the extent the Army was not ████████████████████ ████████████████████████████  the Army should have – but did not correct or clarify its initial EN request upon receipt of DI's response and revised proposal.

35



123.    The Agency's failure to meaningfully advise DI that it had ████████

████████████████████████████████████████████████████████ to its competitive

disadvantage.

124.    But for the Army's misleading direction in EN Number DYN-CP030-20180801-D

Tranche 3, and its subsequent failure to clarify its request upon receipt of DI's response and revised

proposal, ██████████████████████████████████████████.

<div align="center">

**COUNT II:**
**THE ARMY FAILED TO**
**CONDUCT A PROPER COST REALISM DETERMINATION**

**(Violation of the Administrative Procedure Act, 5 U.S.C. § 706, Competition in**
**Contracting Act, 41 U.S.C. § 3701(a), and FAR 15.404-1)**

</div>

125.    Paragraphs 1 through 124 are incorporated by reference as if set forth herein.

126.    The Agency was required to perform a proper cost realism analysis of the

offerors' proposals as required by the RFP and governing law.

127.    The Administrative Procedure Act, requires this Court to "hold unlawful and set

aside agency action, findings and conclusions found to be . . . arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

128.    The Competition in Contracting Act, requires that "[a]n executive agency shall

evaluate sealed bids and competitive proposals, and award a contract, based solely on the factors

specified in the solicitation."  41 U.S.C. § 3701(a).

129.    The RFP required that "[t]he Government will evaluate the realism of the offerors

proposed cost for the cost reimbursable effort through cost realism analysis [in accordance with]

FAR 15.404-1(d)."  The RFP further required that "[t]he total evaluated price for each award

determination will be determined by adding together the offerors proposed cost plus fixed fee for

the cost reimbursable efforts, any cost adjustments necessary based upon the cost realism

analysis, and the offerors proposed price for the firm fixed price effort."

130.    FAR § 15.404-1(d) defines a cost realism analysis as "the process of independently

reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine

whether the estimated proposed cost elements are realistic for the work to be performed; reflect a

clear understanding of the requirements; and are consistent with the unique methods of

performance and materials described in the offeror's technical proposal."

131.    The Agency failed to conduct a proper cost realism analysis and further engaged in

disparate treatment with respect to DI's proposal when the Army failed to evaluate, and accepted,

unrealistically low cost proposals from ████████████████████████████

132.    By way of example, the AR reveals that the Army failed to conduct any analysis of

████████████████████████████ to determine whether they were realistic for the work

performed.  The AR demonstrates that the Army failed to make any independent assessment of

whether the offerors' ████████████████████████████████████████

████████████████████████.  In addition, the Army accepted unrealistically low

cost proposals for the RFP's ████████████████████████████.  By way of

example only, the table below summarizes various tasks in ██████████ that had a ██████████

████████████████████████:

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

██████████████████████████████████████████████████
████████████████████████████████████████

133.   Despite the ███████████████████████████, as exemplified above, the Army failed to make the appropriate effort to understand the ██████ when it purported to perform its cost realism analysis of all Offerors' proposals.

134.   The Agency's failure to conduct a proper cost realism analysis and resulting disparate evaluation of DI's cost proposal was arbitrary, capricious, an abuse of discretion, not in accordance with the law and contrary to the RFP.  There is no rational basis for the Agency's failure to conduct a proper cost realism analysis of the Awardees and DI's cost proposals, which resulted in disparate evaluation of DI's and the Awardees' cost proposals and constitute violations of procurement law and procedure.

135.   The Agency was obligated to carefully evaluate all offerors' cost proposals because the government is bound to pay actual and allowable costs, regardless of what the offeror proposed.  FAR § 15.404-1(d).

136.   The Agency was further obligated to perform a proper cost realism analysis in order to ensure that each offeror's proposed costs were realistic.  *Id*.

137.   It was arbitrary, capricious, an abuse of discretion, not in accordance with governing law and contrary to the RFP for the Agency not to conduct a proper cost realism analysis in connection with the unrealistically low offers submitted by the Awardees.  In view of ███████████████████████████, the Agency, when it was confronted with such ███████████████████████████, was required to make the appropriate effort to understand this ██████ when it performed its cost realism analysis.

138.   The Army accepted unrealistically low cost proposals for the RFP's ██████ ███████████████████████████.  The Army was required to evaluate whether unrealistically low cost proposals were adequate to meet the Army's needs, but it failed

to do so.  Moreover, the Army should have, but did not, adjust the proposals ████████ ██████████ in order to compensate for their unrealistically low ████████ ████████████. Had the Army performed an adequate cost realism evaluation, the Awardees' evaluated costs would have been ████████████████████████

139.   Contrary to its obligations under the law and the RFP, the record does not contain any indication that the Agency performed any analysis to determine the cost realism of the ████████████████████████.

140.   In view of the ████████████████████, the Army should have made the appropriate effort to understand this ██████ when it performed its cost realism analysis of all offerors' proposals.

141.   DI was prejudiced as a result of the Army's failure to conduct a proper cost realism analysis of the multiple unrealistically low and ██████████ cost proposals from the other offerors.  A proper cost realism analysis that addressed the Awardees' unrealistically low cost proposals would have resulted in total evaluated prices for the Awardees that were actually realistic, which in turn would have materially affected the Army's best value determinations in favor of DI.

### COUNT III:
### THE ARMY'S EVALUATION OF
### KBR'S PAST PERFORMANCE WAS ARBITRARY AND CAPRICIOUS AND
### CONTRARY TO LAW

**(Violation of the Administrative Procedure Act, 5 U.S.C. § 706, Competition in Contracting Act, 41 U.S.C. § 3701(a), and FAR 15.305)**

142.   Paragraphs 1 through 141 are incorporated by reference as if set forth herein.

143.   The Army's past performance evaluation of KBR's proposal ignored KBR's ████████████████████████████████ concerning (i) KBR's ██████████



████ ████████████████████████████████████████ incorporated

in the RFP ███████████████████████████; (ii) KBR's ██████████

███████████; and (iii) KBR's █████████████████████████████.

144.    The APA requires this Court to "hold unlawful and set aside agency action,

findings and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

145.    CICA requires that "[a]n executive agency shall evaluate sealed bids and

competitive proposals, and award a contract, based solely on the factors specified in the

solicitation."  41 U.S.C. § 3701(a).

146.    The RFP required that "[p]ast performance, as used in this solicitation, is

evaluated as a predictor of future contract performance."  The RFP further required that "[t]he

Government will assess the degree of confidence it has that the Offeror will successfully

complete the solicitation requirements in accordance with the contract terms based on the

Offeror's demonstrated record of relevant past and current performance."

147.    FAR § 15.305(a) requires "[a]n agency shall evaluate competitive proposals and

then assess their relative qualities solely on the factors and subfactors specified in the

solicitation."  With respect to past performance, FAR § 15.305(a)(2)(ii) requires that "[t]he

solicitation shall describe the approach for evaluating past performance. . . and shall provide

offerors an opportunity to identify past or current contracts (including Federal, State, and local

government and private) for efforts similar to the Government requirement."  FAR

§ 15.305(a)(2)(ii) further requires that "[t]he Government shall consider this information, as well

as information obtained from any other sources, when evaluating the offeror's past

performance."

148.    As set forth below, the Agency's decision to ignore KBR's ███████████

performance in violation of the plain terms of the RFP renders the Agency's action arbitrary,

capricious, an abuse of discretion and not in accordance with the law.

**A.**    **KBR** █████████████████████████████████
███████████████

149.    With respect to KBR's history of █████████████████████

██████████ there was no rational basis for the Agency's decision to re-write KBR's past

performance and to whitewash KBR's ████, which constitutes a violation of procurement law

and procedure.

150.    The record unequivocally demonstrates that █████████████████

████████████████████████████████████████; (ii) the Agency

ignored KBR's ██████████ ████████████████████ (iii) the Agency

ignored ████████████████████████████; (iv) the Agency

relied on ██████████████████████████████████

████████████████████████████████

████; and (v) the Agency falsely claimed that KBR's ████████████████

████ █████████████████████████████

████

151.    ████████████████████████████

█████████████████████████████████████

████████████████████████

███████████████████████████████████
███████████████████████████
████████████

41

████████████████████████████████████
█████████████████████████

…



153.   Rather than consider KBR's history of ███████████████████ ███████, the Army whitewashed and contradicted KBR's documented past performance as set forth in the past performance references provided for this procurement.

**B.      KBR's** ████████████ ███████████████████.

154.   Further, with respect to KBR's ██████ past performance concerning ██████ ███████████ the record unequivocally demonstrates that (i) the Government identified ██████████████████████; (ii) ██████████████████; ██████████████████████; and (iii) ██████████████████████.

155.   The Agency's evaluation flatly ignored KBR's ███████ past performance. The Agency Record does not contain any discussion of the Agency's evaluation regarding concerns raised by this relevant information.

**C.**   **KBR's** ███████████████

156.   The Army's past performance evaluation also ignored KBR's █████ past performance concerning ████████████████████

157.   For example, the Army ignored that: (i) ███████████████ ████████████████████████████████████████ ████████████████████████████████ ████████████████████████████████████ ████████████████████ .

158.   The Agency's past performance evaluation ignored the Government's ███████ ████████████████████████████████████████ ████████████████ - all of which amounted to █████ past performance.

**D.**   **The Failure to Account for These Serious Past Performance Issues Resulted in KBR Receiving an Inflated Past Performance Rating and Evaluation as Compared to DI.**

159.   Ignoring KBR's documented ██████████████████████ ████████████████████ the Agency arbitrary and capriciously assigned KBR with "Substantial Confidence" adjectival ratings that in no way should have matched DI's "Substantial Confidence" adjectival ratings.



160.    Had the Agency properly considered KBR's relevant, ████ past performance, the Agency would have been required to reduce its arbitrary and capricious "Substantial Confidence" rating ascribed to KBR's past performance.

161.    The Agency's decision to ignore KBR's ████ past performance in this regard – which could ████████████████████████████████████ ████████████████████████████████ – is fundamentally arbitrary and capricious.

162.    The RFP acknowledged past performance as a predictor of future performance. As a result, the Agency was required to "assess the degree of confidence it has that KBR will successfully complete the requirements in accordance with the contract terms."  AR Tab 3 at 119.

163.    To predict future performance, the Agency advised offerors that it would use "data obtained from other sources or may use other information with regard to other contracts performed by the Offeror of which it has knowledge, whether or not those contracts are disclosed to the Government by the Offeror."  *Id.*

164.    By ignoring KBR's history of ████████████████████████████ ████████████████████████████████████ ████████████████████████████ the Agency failed to comply with its legal obligation to consider information known to the Agency bearing on the KBR's past performance.  As a direct result of the Agency's failure to consider this information, KBR was provided with unreasonably high past performance ratings of "Substantial Confidence," which diluted DI's strong past performance.

165.    The Agency's failure in this regard distorted the Agency's best value analysis and required that DI shoulder the inequities that spring from the Agency's failure to obtain, and consider, KBR's relevant ███████ past performance.

166.    The Agency's failure in this regard distorted the Agency's best value analysis and resulted in the Agency's improper past performance evaluation of KBR's proposal and, as discussed below, resulted in an improper best value trade off.

167.    For this best value procurement, any change in KBR's past performance rating requires a new best value tradeoff.

168.    DI was prejudiced by the Agency's failure to consider this relevant past performance because the Agency's failure caused it to inflate KBR's past performance rating and impaired the Agency's best value award decisions.

<div align="center">

**COUNT IV:**
**THE ARMY'S BEST VALUE TRADEOFF**
<u>**DETERMINATION WAS ARBITRARY AND CAPRICIOUS AND CONTRARY TO**</u>
<u>**LAW**</u>

**(Violation of the Administrative Procedure Act, 5 U.S.C. § 706, Competition in Contracting Act, 41 U.S.C. § 3701(a), and FAR § 15.101-1)**

</div>

169.    Paragraphs 1 through 168 are incorporated by reference as if set forth herein.

170.    The Agency was required to perform a proper best value tradeoff determination of the offerors' proposals as required by the RFP and governing law.

171.    The APA, requires this Court to "hold unlawful and set aside agency action, findings and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

<div align="center">45</div>

████████████████████████████████████████████

172.    CICA requires that "[a]n executive agency shall evaluate sealed bids and competitive proposals, and award a contract, based solely on the factors specified in the solicitation."  41 U.S.C. § 3701(a).

173.    FAR § 2.101 defines "best value" as "the expected outcome of an acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement."

174.    FAR § 15.101-1 provides that a best value tradeoff process "is appropriate when it may be in the best interest of the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror."  FAR § 15.101-1(b) imposes the following requirements for awards based on a best value trade-off: (i) "[a]ll evaluation factors and significant subfactors that will affect contract award and their relative importance shall be clearly stated in the solicitation," and (ii) "[t]he solicitation shall state whether all evaluation factors other than cost or price, when combined are significantly more important than, approximately equal to, or significantly less important than cost or price."  FAR § 15.101-1(c) requires that "[t]he perceived benefits of the higher priced proposal shall merit the additional cost, and the rationale for tradeoffs must be documented in the file in accordance with 15.406."

175.    The RFP required that awards "will be made using a Best Value Continuum Tradeoff Process authorized at FAR 15.101-1" and that "[t]he best value source selection will be based on an integrated assessment of the following four (4) evaluation factors: Technical/Management, Past Performance, Small Business Participation, and Cost/Price."

176.    The RFP further required as follows:

> Contract awards will be made to responsible Offerors whose proposals are determined to provide the best value to the Government based upon the evaluation criteria identified herewith.

> The Source Selection Authority (SSA) will make an award to the responsible Contractor whose proposal conforms to the solicitation and is determined to provide the best value to the USG considering price and non-price factors with relative importance assigned to each, and in accordance with FAR Subpart 9.105. This may result in an award to other than the lowest-prices or highest rated Offeror.

177. With regard to relative importance of price and non-price factors, the RFP assigned the following relative order of importance to the evaluation factors:

> Technical/Management is more important than Past Performance.
>
> Past Performance is more important than Small Business Participation.
>
> Small Business Participation is more important than Cost/Price.
>
> All evaluation factors other than Cost/Price, when combined, are significantly more important than Cost/Price.
>
> Although Cost/Price is not the most important factor, it could become a controlling factor if offers under the non-price factors tend to equalize. The closer the ratings in the non-Cost/Price factors, the more significant Cost/Price becomes.

178. The RFP required the Government to conduct individual best value decisions and make all awards concurrently. For each of the operation priority groupings (EUCOM, PACOM, CENTCOM, NORTHCOM, AFRICOM, SOUTHCOM), the RFP required the Government to "make an award (Basic IDIQ and associated Task Order(s)) to the responsible Offeror determined to provide the best value to the USG, considering price and non-price factors with relative importance assigned to each."

179. The Agency failed to conduct a proper best value tradeoff determination in accordance with the objective parameters of the RFP and governing law because the Agency's analysis was based on its arbitrary and capricious and fundamentally flawed technical, cost realism

and past performance evaluations and ratings as alleged in this Complaint, which allegations are incorporated herein by reference.

180.    For each of the operation priority groupings, the Agency found DI's proposal did not offer the best value based on the Agency's arbitrary and capricious evaluation of the offerors' technical/management approach, cost/price, labor staffing models and past performance.  By way of example only, for EUCOM and NORTHCOM, the Agency arbitrarily justified its best value tradeoff decision on its arbitrary and capricious conclusion that ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████

181.    By way of further example, the Army's failure to provide all offerors with meaningful and equal discussions (as alleged above) resulted in fundamentally flawed technical ratings, deprived DI of the opportunity to ███████████ and rendered the Army's best value tradeoff determination arbitrary and capricious.  The purpose of meaningful and equal discussions is to maximize the government's ability to obtain the best value in a contract award based on the requirements and the evaluation factors set forth in the solicitation.  The Army's failure to provide meaningful and equal discussions profoundly tainted the obligatory best value tradeoff analysis, rendering the Army's decision arbitrary and capricious.

182.    The Agency's best value tradeoff determination did not reasonably consider and did not exercise reasonable, independent business judgment as to the relative merits of each offeror's price and non-price factors.    Instead, the Agency based its best value tradeoff determination on evaluations and ratings that were fundamentally flawed and arbitrary, rendering the best value award itself arbitrary and capricious.

48

████████████████████████████████████████

████████████████████████████████

183.   In addition, where the Agency found that DI's proposal was technically superior or purportedly "comparable" to proposals from other offerors, the Agency's best value determination did not specifically explain why DI's proposal ████████████████████  Instead, the Agency's best value determination merely stated those findings were ████████████ ██████████.  The Agency's failure to specifically explain why DI's proposal ████████ ██████████ was arbitrary and capricious.

184.   The Agency's best value tradeoff determinations did not articulate a rational connection between the purported facts found and the choice made not to issue any award to DI. The Agency failed to reasonably exercise its discretion in conducting the best value tradeoff analysis mandated by the RFP, rendering the Agency's best value tradeoff analysis arbitrary and capricious.  Had the Agency conducted a proper best value tradeoff determination that was not based on its arbitrary and capricious price and non-price evaluations, the Agency would have determined that DI's proposal was the best value, requiring the award of an IDIQ contract to DI under the operation priority groupings.  DI was prejudiced as a result of the Agency's failure to conduct proper best value trade off determinations.

### COUNT V:
### INJUNCTIVE RELIEF

185.   Paragraphs 1 through 184 are incorporated by reference as if set forth herein.

186.   DI has been prejudiced by the Army's violations of federal law, the RFP requirements and the Army's arbitrary and capricious award of the IDIQ contracts.

187.   If this Court denies DI the injunctive relief requested, DI will suffer permanent and irreparable injury, which could not be compensated otherwise.  Specifically, DI will lose its opportunity to compete on a fair and lawful basis for one of the Army's LOGCAP V IDIQ



contracts, and will lose the profits it would have made under any subsequent task orders issued

thereunder.  The only other relief available to DI at law – reimbursement of its bid protest costs –

is grossly insufficient to compensate DI for the irreparable and permanent harm it will suffer if an

injunction denied.  Thus DI requests a permanent injunction against the Army to prevent it from

proceeding under the IDIQ contracts awarded to Fluor, KBR, P2GLS and Vectrus.

188.    Issuance of an injunction would serve the public interest because the public has an

interest in open, honest, and fair competition in the federal procurement system, and because that

interest was compromised when the Army acted arbitrarily and violated federal procurement law.

Thus, the grant of an injunction would enhance the integrity of the federal procurement system

and is in the public's best interest.

189.    A balancing of hardships also favors granting injunctive relief to DI because DI

will suffer permanent and irreparable injury if the injunction is not granted and, conversely, the

Army will not be harmed if injunctive relief is granted.

### PRAYER FOR RELIEF

WHEREFORE, DI respectfully requests that this Court:

a.      Declare that the Army's evaluation was contrary to law;

b.      Enter a permanent injunction enjoining the Army from proceeding with the IDIQ

contracts awarded under the RFP;

c.      Order the Army to, among other things: (i) rescind the IDIQ contracts; (ii) re-open

discussions to provide meaningful and equal discussions, (iii) conduct a new evaluation consistent

with law, regulation, and the RFP; and (iv) conduct a rational best value determination on which

to base the contract award;

      d.      Grant DI its costs and fees incurred in pursuing this action to the extent permitted under law, and its expenses incurred in responding to the RFP;

      e.      Grant DI such other and further relief as this court deems just and proper.

Dated: August 5, 2019

Respectfully submitted,

**REED SMITH LLP**

/s/ Holly A. Roth
Holly A. Roth
1301 K Street, N.W. Suite
1000 – East Tower
Washington, DC 20005
Tel: (202) 414-9423
Fax: (202) 414-9299
*Lead Counsel for DynCorp International LLC*

**Of counsel:**
Elizabeth Leavy
William Kirkwood
1301 K Street N.W. Suite
1000, East Tower
Washington,   D.C.   20005
Ph: 202-414-9200
Fax: 202-414-9299
eleavy@reedsmith.com
wkirkwood@reedsmith.com

Francisca Mok
1901 Avenue of the Stars
Suite 700
Los Angeles, CA 90067-6078
Ph: 310-734-5287
Fax: 310-734-5299
fmok@reedsmith.com

Nicholas Albu
7900 Tysons One Place
Suite 500
McLean, VA 22102
Ph: 703-641-4253
Fax: 703-641-4340
nalbu@reedsmith.com

*Attorneys for DynCorp*
*International LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2019, a true and correct copy of the foregoing has

been electronically filed with the Clerk of the Court using the CM/ECF system.  I further

certify that I caused a true and correct copy of the foregoing to be emailed to all attorneys of

record.  I further certify that a true and correct copy of the foregoing has been sent by email to:

Will Rayel
Senior Trial Counsel
National Courts Section
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L St., NW, Room 9106
Washington, DC 20530
phone: (202) 616-0302
facsimile: (202) 307-0972
William.rayel@usdoj.com

Stephanie M. James, DA Civilian
Procuring Contracting Officer
Army   Contracting   Command-Rock
Island
1 Rock Island Arsenal
Rock Island, IL 61299
stephanie.m.james43.civ@mail.mil

Kellogg, Brown & Root Services, Inc.
c/o Lee P. Curtis
Perkins Coie
700 13th Street, NW, Suite 600
Washington, DC 20005
lcurtis@perkinscoie.com

Wade L. Brown, Esq.
Associate Command Counsel
Chief, Bid Protest/Litigation Branch
U.S. Army Material Command
Attn: AMCCC, Office A6SE062
4400 Martin Road
Redstone Arsenal, AL 35898
wade.l.brown2.civ@mail.mil

Vectrus Systems Corp.
c/o Kevin P. Mullen
Morrison Foerster
2000 Pennsylvania Ave., NW
Washington, DC 20006
kmullen@mofo.com

PAE-Parsons Gloval Logistics, LLC
c/o Anuj Vohra
Crowell & Morning LLP
1001 Pennsylvania Ave., NW
Washington, DC 20004
avohra@crowell.com

Fluor Intercontinental, Inc.
c/o Andrew Shipley
Wilmer Hale
1875 Pennsylvania Ave, NW
Washington, DC 20006
Andrew.shipley@wilmerhale.com


/s/  Holly  A.  Roth
Holly A. Roth

53


Clear Form

# In The United States Court of Federal Claims

## Cover Sheet

Plaintiff(s) or Petitioner(s)

Names: DynCorp International LLC                    19-1133 C

Location of Plaintiff(s)/Petitioner(s) (city/state): Mclean, Virginia

(If this is a multi-plaintiff case, pursuant to RCFC 20(a), please use a separate sheet to list additional plaintiffs.)

Name of the attorney of record (See RCFC 83.1(c)): Holly A. Roth

Firm Name: Reed Smith LLP

Contact information for pro se plaintiff/petitioner or attorney of record:

Post Office Box:

Street Address: 1301 K St., NW, Suite 1000-East Tower

City-State-ZIP: Washington, DC 20005

Telephone & Facsimile Numbers: 202-414-9423; Fax 202-414-9299

E-mail Address: hroth@reedsmith.com

Is the attorney of record admitted to the Court of Federal Claims Bar?  ● Yes ○ No

Nature of Suit Code: 140                    Agency Identification Code: ARM
Select only one (three digit) nature-of-suit code from the
attached sheet.                             Number of Claims Involved: 5
Amount Claimed: $ n/a
                Use estimate if specific amount is not pleaded.

Bid Protest Case (required for NOS 138 and 140):
Indicate approximate dollar amount of procurement at issue: $ $82,000,000,000

Is plaintiff a small business?  ○ Yes ● No

Was this action preceded by the filing of a  ● Yes ○ No
protest before the GAO?

If yes, was a decision on the merits rendered?  ● Yes ○ No

Income Tax (Partnership) Case:
Identify partnership or partnership group: N/A

Takings Case:
Specify Location of Property (city/state): N/A

Vaccine Case:
Date of Vaccination: N/A

Related Case:
Is this case directly related to any pending or previously filed  ○ Yes ● No
case(s) in the United States Court of Federal Claims? If yes, you are
required to file a separate notice of directly related case(s) See RCFC 40 2

178