# In the United States Court of Federal Claims

No. 19-1133
Filed: May 21, 2020
Reissued: June 8, 2020[1]

| | | |
|---|---|---|
| DYNCORP INTERNATIONAL LLC, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Post-Award Bid Protest; Judgment on the Administrative Record; RCFC 52.1; |
| THE UNITED STATES, | ) ) | Technical/Management Approach; Labor Staffing Model; Indefinite-Delivery |
| Defendant, | ) ) | Indefinite-Quantity Contract; Task Order Contract; Firm-Fixed Price; |
| and | ) ) | Cost-Plus-Fixed-Fee; Administrative Procedure Act; Arbitrary and Capricious; |
| KELLOGG, BROWN & ROOT SERVICES, INC., VECTRUS SYSTEMS CORPORATION, FLUOR INTERCONTINENTAL, INC., and PAE-PARSONS GLOBAL LOGISTICS SERVICES, LLC, | ) ) ) ) ) ) ) | Price Reasonableness; FAR 15.404-1(b); Value Analysis; FAR 15.404-1(b)(4); Cost Realism; FAR 15.404-1(d); Unequal Discussions; Past Performance; Prejudice. |
| Defendant-Intervenors. | ) ) | |

*Lawrence Philip Block*, Reed Smith LLP, Washington, DC, for plaintiff.

*William Porter Rayel*, U.S. Department of Justice, Civil Division, Washington, DC, for defendant.

*Andrew Emil Shipley*, Wilmer Cutler, et al., LLP, Washington, DC, for defendant-intervenor, Fluor Intercontinental, Inc.  *Anuj Vohra*, Crowell & Moring LLP, Washington, DC, for defendant-intervenor, PAE-Parsons Global Logistics Services, LLC.  *Kevin Patrick Mullen*, Morrison & Foerster, LLP, Washington, DC, for defendant-intervenor, Vectrus Systems Corporation.  *Lee Paul Curtis*, Perkins Coie, Washington, DC, for defendant-intervenor, Kellogg, Brown & Root Services, Inc.

---

[1] An unredacted version of this Opinion and Order was issued under seal on May 21, 2020. The parties were given an opportunity to propose redactions, and those redactions are reflected herein.

**OPINION AND ORDER**

*SMITH*, **Senior Judge**

      This post-award bid protest comes before the Court on the parties' Cross-Motions for Judgment on the Administrative Record.  Plaintiff, DynCorp International LLC ("DynCorp"), challenges the decision by the United States Department of the Army ("Army" or "Agency") to award four Indefinite-Delivery Indefinite-Quantity ("IDIQ") contracts for logistics support services to defendant-intervenors, Kellogg, Brown & Root Services, Inc. ("KBR"), Fluor Intercontinental, Inc. ("Fluor"), Vectrus Systems Corporation ("Vectrus"), and PAE-Parsons Global Logistics Services, LLC ("P2GLS"), under Request for Proposal No. W52P1J-16-R-0001 ("RFP" or "Solicitation").  *See generally* Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Motion for Judgment on the Administrative Record (hereinafter "Pl.'s MJAR").  Plaintiff alleges the following: (1) the Administrative Record fails to document a rational evaluation and decision-making process; (2) the record suggests that DynCorp was treated unfairly and disparately; and (3) the evaluation ratings are materially divorced from the underlying facts.  *Id.* at 1.  For the reasons set forth below, plaintiff's Motion for Judgment on the Administrative Record is granted-in-part and denied-in-part, and defendant and defendant-intervenors' Cross-Motions for Judgment on the Administrative Record are granted-in-part and denied-in-part.

    **I.**    **Background**

      On November 20, 2017, the Army issued the Solicitation for the Logistics Civil Augmentation Program ("LOGCAP") V procurement for logistics support services.  Administrative Record (hereinafter "AR") 2510–11.  The Solicitation stated that the Army would award between four and six IDIQ contracts to cover the six Geographic Combatant Commands ("COCOM") and Afghanistan.  AR 2511.  The IDIQ contracts were divided into three Operational Priority Groupings, listed in descending order of priority as follows: (1) European Command ("EUCOM") and Pacific Command ("PACOM"); (2) Central Command ("CENTCOM"), Northern Command ("NORTHCOM"), African Command ("AFRICOM"), and Southern Command ("SOUTHCOM"); and (3) Afghanistan.  AR 2624.  IDIQ contracts were to be awarded concurrently with the task orders for each COCOM and Afghanistan.  AR 2511, 2624.

      The Solicitation directed the Agency to award each contract on a best-value basis according to the following four factors, listed in descending order of importance: (1) Technical/Management; (2) Past Performance; (3) Small Business Participation; and (4) Cost/Price.  AR 2624.  When combined, the three non-price factors were significantly more important than Cost/Price.  AR 2624.  Under the Technical/Management Factor, the Army evaluated offerors' regional capabilities, management approach, key initiatives, and Labor Staffing Models ("LSMs").  AR 2626–27.  Offerors were given discretion in creating their base

LSMs, but they were required to submit proposals that could predict labor staffing mix, types, and quantities necessary to accomplish the Solicitation's requirements. AR 2627. When assigning Technical/Management ratings, the Agency considered the impact of each offeror's approach in the following LOGCAP V risk areas: responsiveness, affordability, predictability, capability, accountability, and flexibility. AR 2626.

In evaluating an offeror's past performance, the Army looked to an offeror's demonstrated record of recent and relevant past performance in "assess[ing] the degree of confidence it ha[d] that the Offeror [could] successfully complete the Solicitation requirements." AR 2627–28. Under the Cost/Price Factor, the Solicitation directed the Army to separately evaluate the reasonableness of each offeror's Firm-Fixed-Price ("FFP") contract line item numbers ("CLINs") and Cost-Plus-Fixed-Fee ("CPFF") CLINs, and, additionally, to evaluate the realism of the CPFF cost elements in each offeror's proposal. AR 2629–30.

On February 26, 2018, six offerors submitted proposals for the LOGCAP V procurement, all of which were included in the competitive range; each offeror participated in multiple rounds of discussions.[2] AR 70612. Interim proposals were submitted on July 18, 2018 and on October 21, 2018. AR 70849. Final proposal revisions ("FPRs") were submitted on December 21, 2018, and on February 6, 2019. *Id.* DynCorp received over one hundred evaluation notices ("ENs"), of which thirty-nine related to Cost/Price and over forty-five of which concerned DynCorp's LSM. *See generally* AR 70859–63. After receiving offerors' second interim proposals, the Contracting Officer ("CO") determined that DynCorp provided the highest cost proposals in five of the regions. AR 124863–64. She did not engage in discussions related to price at that time, as the Army did not consider DynCorp's prices to be "too high." AR 124863–64. Moreover, the CO believed DynCorp's prices were not unreasonable given DynCorp's acceptable technical approach. AR 124864.

The Army evaluated each offeror's proposal; the Cost/Price Factor Chair completed a Final Cost/Price Evaluation Report for each offeror in every COCOM and Afghanistan, the Source Selection Evaluation Board ("SSEB") issued an Evaluation Report regarding non-price factors, the Source Selection Advisory Council ("SSAC") issued a Comparative Analysis Report, the Source Selection Authority ("SSA") issued a Source Selection Decision Document ("SSDD"), and the CO completed separate Determinations of Price Reasonableness for each COCOM and Afghanistan. *See generally* AR 68247–9865, 70031–175, 70305–479, 70609–34, 73819–32. On April 12, 2019, the Army concurrently awarded four IDIQ contracts and related task orders for the corresponding regions as follows: (1) KBR received EUCOM, NORTHCOM, and Afghanistan; (2) Vectrus received PACOM and CENTCOM; (3) Fluor received AFRICOM; and (4) P2GLS received SOUTHCOM. AR 70776–82. In each region, DynCorp proposed higher prices and/or received inferior ratings under the non-price factors as compared to the awardee. *See generally* AR 70619–32.

DynCorp received a "Good" rating for its Technical/Management proposal in all six COCOMs, and an "Acceptable" rating in Afghanistan. AR 749160–61. The Agency determined

---

[2]   The six offerors were DynCorp, KBR, Vectrus, Fluor, P2GLS, and AECOM Management Services, Inc. ("AECOM").

that DynCorp's LSM was "feasible and capable of being used to successfully meet the requirements," and expressed confidence in DynCorp's LSM being "consistent, scalable, and adjustable." AR 68276. The Army did not find any weaknesses or deficiencies in DynCorp's LSM, but the Agency did determine that the LSM was "generic and simplistic." *Id.* The Agency also found that DynCorp failed to mitigate risks with transparency, affordability, and predictability, and thus was not worthy of a receiving a strength for either its LSM or Labor Staffing Approach. *See* AR 68276, 2626.

On April 22, 2019, DynCorp filed a protest with the Government Accountability Office ("GAO"). AR 843. In a July 31, 2019 Opinion, the GAO denied DynCorp's protest, finding that the Army engaged in meaningful discussions regarding DynCorp's LSM, and that the Army was not required to address DynCorp's high prices. AR 749157. The GAO also found that the Army did not engage in unequal discussions regarding cost issues with other offerors, and that there was no merit to the price reasonableness evaluation errors DynCorp specifically alleged in its GAO protest. *See generally* AR 749157–71.

On August 5, 2019, plaintiff filed its Complaint with this Court, arguing that its "bid protest is the result of the Army's violation of law and undeniably arbitrary and capricious action and irrational disparate treatment." Complaint at 2. On August 16, 2019, plaintiff filed an amended complaint, and on October 7, 2019, it filed its Motion for Judgment on the Administrative Record. *See generally* Amended Complaint; Pl.'s MJAR. Defendant filed its Cross-Motion for Judgment on the Administrative Record and Response on October 22, 2019. *See generally* Defendant's Cross-Motion for Judgment on the Administrative Record and Response to Plaintiff's Motion for Judgment on the Administrative Record (hereinafter "Def.'s CMJAR"). That same day, defendant-intervenors filed their respective Cross-Motions for Judgment on the Administrative Record and Responses. *See generally* Vectrus's Cross-Motion for Judgment on the Administrative Record and Response in Opposition to DynCorp's Motion; Fluor Intercontinental, Inc.'s Cross-Motion for Judgment on the Administrative Record and Response to DynCorp's Motion for Judgment on the Administrative Record; Kellogg, Brown & Root Services, Inc.'s Cross-Motion for Judgment on the Administrative Record; PAE-Parsons Global Logistics Services, LLC's Response to DynCorp International LLC's Motion for Judgment on the Administrative Record and Cross-Motion for Judgment on the Administrative Record.

On November 4, 2019, plaintiff filed its Response and Reply. *See generally* DynCorp International LLC Reply in Support of Motion for Judgment on the Administrative Record and Opposition to Defendant and Intervenors' Cross-Motions for Judgment on the Administrative Record (hereinafter "Pl.'s Reply"). Defendant and defendant-intervenors filed their Replies on November 14, 2019. *See generally* Defendant's Reply to Plaintiff's Response to Defendant's Cross-Motion for Judgment on the Administrative Record (hereinafter "Def.'s Reply"); Vectrus's Reply in Opposition to DynCorp's Response; Fluor Intercontinental, Inc.'s Reply in Support of Cross-Motion for Judgment on the Administrative Record; Kellogg, Brown & Root Services, Inc.'s Reply in Support of Its Cross-Motion for Judgment on the Administrative Record; PAE-Parsons Global Logistics Services, LLC's Reply in Support of Its Cross-Motion for Judgment on the Administrative Record. The Court held oral argument on November 25, 2019. This case is fully briefed and ripe for review.

## II. Standard of Review

This Court's jurisdictional grant is found primarily in the Tucker Act, which gives the Court the power "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency . . . or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2018).[3] In a bid protest, this Court "may award any relief that the court considers proper, including declaratory and injunctive relief." § 1491(b)(2).

This Court evaluates bid protests under the Administrative Procedure Act's standard of review for agency actions. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (citing 28 U.S.C. § 1491(b)(4); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). Thus, agency procurement actions may only be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706 (2018) (incorporated in 28 U.S.C. § 1491(b)(4)). The "arbitrary and capricious standard applicable [in bid protests] is highly deferential." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). Agencies and their "[c]ontracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Impresa*, 238 F.3d at 1332 (quoting *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)); *see also Savantage Fin. Servs. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010).

Pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"), a party may file a motion for judgment on the administrative record for the Court to determine whether an administrative body, given all disputed and undisputed facts in the record, acted in compliance with the legal standards governing the decision under review. RCFC 52.1; s*ee also Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 382 (2013) (citing *Fort Carson Support Servs. v. United States*, 71 Fed. Cl. 571, 585 (2006)). On such a motion, the parties are limited to the Administrative Record, and the Court must make findings of fact as if it were conducting a

---

[3] Neither defendant nor defendant-intervenors requested that the Court dismiss plaintiff's claims concerning the Afghanistan region. Pursuant to Rules 12(b)(1) and 12(h)(3), however, the Court must dismiss any claims over which it lacks subject-matter jurisdiction. RCFC 12(b)(1); RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). The Federal Streamlining Act ("FASA") limits this Court's jurisdiction by excepting from it protests that are "in connection with the issuance or proposed issuance of a task or delivery order except for . . . a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued." 10 U.S.C. § 2304c(e) (2018). As award of the Afghanistan region by itself could not have triggered the award of a Multiple Award Task Order Contract, the Afghanistan award is a true task order award. *See* AR 2511–12, 2625. As such, the FASA bars this Court's review of any arguments exclusively related to the Afghanistan region. *See Fluor Intercontinental, Inc. v. United States*, No. 19-1580, ECF No. 52; *PAE-Parsons Global Logistics Services, LLC v. United States*, No. 19-1205, ECF No. 78.

trial on a paper record. RCFC 52.1; *Bannum*, 404 F.3d at 1354. Looking to the Administrative Record, the Court must determine whether a party has met its burden of proof based on the evidence in the record. *Bannum*, 404 F.3d at 1355.

When a protestor claims that an agency's decision violates a statute, regulation, or procedure, the protestor must show that such alleged violation was "clear and prejudicial," as the Court will "interfere with the government procurement process 'only in extremely limited circumstances.'" *EP Prods., Inc. v. United States*, 63 Fed. Cl. 220, 223 (2005) (quoting *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1989)). "If the [C]ourt finds a reasonable basis for [an] agency's action, the [C]ourt should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). The Court cannot substitute its judgment for that of an agency, even if reasonable minds could reach differing conclusions. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

### III. Discussion

In its Motion for Judgement on the Administrative Record, plaintiff claims that the Army acted irrationally, arbitrarily, and capriciously as follows: (1) failing to provide adequate support or documentation for KBR's Past Performance ratings; (2) conducting "misleading and disparate discussions," thereby depriving plaintiff of an opportunity to address the Army's concerns; and (3) failing to conduct proper cost realism and price reasonableness analyses by not following the requirements set forth in the Solicitation and the FAR. *See generally* Pl.'s MJAR at 3–4, 14, 22, 25. The Court will address each of these claims in turn.

#### A. Past Performance

Plaintiff alleges that in awarding KBR a "Substantial Confidence" Past Performance rating, the Army "whitewash[ed]" KBR's past performance record by ignoring issues with ▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮▮. *See* Pl.'s MJAR at 25. Specifically, plaintiff claims that the Army failed to adequately document the reasons behind its assignment of a "Substantial Confidence" rating. *See id.* at 29–34. In its Response, defendant argues that the Army "considered KBR's recent adverse past performance information" and rationally assigned KBR a "Substantial Confidence" rating. *See* Def.'s CMJAR at 40–41.

The RFP required that an offeror's past performance record be "evaluated as a predictor of future contract performance." AR 2627. The RFP further indicated that an offeror's issues with resolving problems under prior contracts or a lack of relevant performance history would be considered in the Army's Past Performance evaluation. AR 2628. Additionally, any "negative finding" related to an offeror's past performance could result in "an overall lower confidence assessment rating." AR 2628. A rating of "Substantial Confidence" was only appropriate where the Army has a "high expectation" of successful performance. *Id.*

6

Agencies are afforded broad discretion in evaluating an offeror's past performance record, and the Court's review of an Agency's Past Performance evaluation is "limited to determining whether the evaluation was reasonable, consistent with stated evaluation criteria and complied with relevant statutory and regulatory requirements." *See Westech Int'l, Inc. v. United States*, 79 Fed. Cl. 272, 293 (2007) (quoting *JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650, 659 (2002)). A Past Performance evaluation will be found reasonable when the Agency gave "meaningful consideration" to any possible adverse Past Performance information documented in the offeror's record. *Vanguard Recovery Assistance, Joint Venture v. United States*, 99 Fed. Cl. 81, 95 (2011).

The Administrative Record indicates that KBR has had issues involving ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and noncompliance with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ requirements under LOGCAP IV. *See generally* AR 125729–40, 223874–88. However, when the record is looked at holistically, the plaintiff's Past Performance allegations are unsupported. While the plaintiff focuses on adverse past performance ratings and non-conformance reports ("NCR") issued during LOGCAP IV, those performance issues only make up a discrete portion of what the Agency actually reviewed. The record indicates that the Agency's past performance analysis included the review of over sixteen relevant past projects. *See generally* AR 68826–67, 68831. As defendant points out, KBR began reporting all ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ while performing under the LOGCAP IV contract. Def.'s CMJAR at 45 (citing AR 10687). Furthermore, while KBR had past issues related to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, defendant explained that those issues only affected a small percentage of the over $85 million worth of ▮▮▮▮▮▮▮▮▮▮▮▮▮ that KBR managed. *Id.* at 44 (citing AR 10688). Finally, KBR responded to its "Unsatisfactory" ratings and NCRs with corrective action plans to ensure those issues did not reoccur, AR 10687, and the record demonstrates that the Agency analyzed those corrective action plans as part of its Past Performance evaluation. AR 68833.

The Administrative Record clearly indicates that the Past Performance Evaluation Team meaningfully considered KBR's Past Performance, and the record as a whole supports the Army's assignment of a "Substantial Confidence" rating to the same. *See generally* AR 68805–69; *see also Vanguard Recovery*, 99 Fed. Cl. at 95. As such, where, as here, the Agency gives meaningful consideration to Past Performance, and its evaluation thereof is reasonable, the Court will not infringe upon the Agency's decisionmaking. *See Glenn Def. Marine Asia v. United States*, 105 Fed. Cl. 541, 564 (2012). Accordingly, the Court finds that the Army appropriately evaluated and rated KBR's Past Performance.

### B. Discussions

Plaintiff alleges that the Army engaged in misleading and disparate discussions as follows: (1) failing to conduct meaningful discussions regarding plaintiff's allegedly "unreasonably high" prices; (2) conducting unequal discussions regarding plaintiff's cost/price volume and LSM; and (3) misleading plaintiff into unnecessarily amending its prices to its disadvantage. *See* Pl.'s MJAR at 4–10. This Court reviews each claim in turn.

1. **High Prices**

In addition to its Cost/Price arguments, which the Court addresses below, plaintiff claims that the Army was required to advise DynCorp that its Cost/Price proposal was "unreasonably high" during discussions. Pl.'s MJAR at 4. While it is true that an agency must hold discussions when an offeror's Cost/Price is determined to be "unreasonably high," an agency need not hold discussions if the offeror's prices are merely "too high." *See WorldTravelService v. United States*, 49 Fed. Cl. 431, 439 (2001); *see also* 48 C.F.R. § 15.306(e)(3) (2019); *DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 669 (2010). Moreover, an agency cannot reveal that an offeror's prices are higher than other offeror's prices without the latter's permission. *See* § 15.306(e)(3). For the reasons explained *infra*, the Court has determined that the Agency's price reasonableness evaluations were flawed. As the Agency must reevaluate price proposals, that reevaluation could impact the Agency's assessment of DynCorp's prices. However, the Court cannot evaluate whether the absence of discussions that could potentially stem from such a failure was arbitrary and capricious absent speculation on the outcome of the forthcoming proper price reasonableness analyses. As such, the Court will not endeavor to make such a speculation-based determination.

2. **Cost/Price and LSM**

Plaintiff next alleges that the Army failed to conduct meaningful discussions regarding DynCorp's Cost/Price volume and LSM in violation of Federal Acquisition Regulation ("FAR") 1.602 and FAR 15.306(d). Pl.'s MJAR at 4. Specifically, plaintiff claims that the Army conducted unequal discussions in violation of FAR 1.602-2 and FAR 15.306 by affording only some awardees the opportunity to respond to the Agency's concerns related to the offerors' respective Cost/Price proposals. *Id.* at 8. In support of that argument, plaintiff points to the CO's December Memorandum, in which the Army allegedly documented its concerns with DynCorp's price proposal. *Id.* Plaintiff further posits that the Army violated FAR 15.306(d) and 1.602-2 by failing to hold discussions regarding allegedly significant weaknesses in DynCorp's LSM. *Id.* at 10. Plaintiff argues that these "significant weaknesses" downgraded its Technical/Management rating from "Outstanding" to "Good," which adversely impacted its chance of award. *Id.* at 10–11.

In response, defendant claims that the Agency had no "open concerns" with DynCorp's price proposal and that DynCorp's alleged price concerns are uniquely different than the concerns that gave rise to the Cost/Price discussions the Agency held with other offerors. Def.'s CMJAR at 18–19. The government also argues that it was not required to hold discussions related to DynCorp's LSM approach, as it contained no deficiencies or "significant weaknesses." *Id.* at 21. Additionally, defendant alleges that, even if the Army was required to discuss DynCorp's allegedly too-high prices, failing to do so was nonprejudicial because "DynCorp's proposal was inferior to each awardee on the combined non-price factors." *Id.* at 19 (emphasis omitted).

The FAR requires COs to discuss any "deficiencies, significant weaknesses, and adverse past performance information" with each offeror still in consideration for award that has not yet been afforded an opportunity to respond. 48 C.F.R. § 15.306(d)(3). That requirement notably

does not extend to "every area where the [offeror's] proposal could be improved." *Id.* Additionally, this Court has also explained that when conducting discussions with offerors in the competitive range, the government cannot favor one offeror over another. *See Kerr Contractors, Inc. v. United States*, 89 Fed. Cl. 312, 329 (2009), *aff'd*, 374 F. App'x 979 (Fed. Cir. 2010). Discussions are unequal when "a crucial advantageous piece of information is withheld from some but not all offerors remaining in the competition." *See Kerr Contractors, Inc.*, 89 Fed. Cl. at 329.

After receiving offerors' FPRs, the Army reopened discussions with four offerors. AR 73898. The Army did not, however, reopen discussions with DynCorp, as the Army had no "open concerns" with DynCorp's prices. AR 73898. The Agency's discussions with other offerors related to specific proposal flaws, such as P2GLS's fee on non-fee bearing costs in AFRICOM, Vectrus's unrealistic fringe rate, and KBR's failure to convert Euros to U.S. Dollars. *See generally* AR 73894–902. As the Agency never determined that DynCorp's prices were too high, and as DynCorp's proposal did not contain any specific flaws that would trigger discussions, the Agency was not required to hold discussions. Moreover, the Army's decision to only hold discussions with offerors that submitted flawed proposals does not constitute disparate or unequal discussions related to Cost/Price. While the Agency considered DynCorp's LSM approach to be simplistic, the Technical/Management Evaluation Team ultimately determined that DynCorp's LSM was consistent, scalable, adjustable, and sufficient to successfully meet the requirements. AR 68275–80. The Agency did not, however, consider DynCorp's simplistic approach to be a significant weakness. AR 68276–80. As such, the Agency was not required to open discussions with DynCorp regarding its LSM approach, and its failure to do so did not constitute a violation of the FAR.

### 3. Misleading Discussions

Finally, plaintiff alleges that the Army misled DynCorp by suggesting that it needed to raise its prices. Pl.'s MJAR at 12. Plaintiff argues that by failing to advise DynCorp that the adjustment was unnecessary, DynCorp significantly and unnecessarily increased its prices. Pl.'s MJAR at 12. During discussions, the Army instructed DynCorp to "provide further documentation to support the approximate ▮ normalization factor, including recent sample payroll records to support that DynCorp has hired at the proposed rates for similar work." AR 71214. Plaintiff interpreted this request as a requirement that it "change its reliance on market surveys to actual historical wages," and, as a result, DynCorp revised its prices to reflect historical wage rates. Pl.'s MJAR at 12–13. In effect, plaintiff's argument is essentially that the Agency should have realized that a misunderstanding arose based on DynCorp's responses to the EN, and when unambiguous language results in a misunderstanding, the Agency is required to address that misunderstanding. *See id.* at 14. Plaintiff's interpretation is incorrect.

This Court has consistently held that an error in communicating weaknesses that results in an offeror revising its proposal is "quintessentially a misleading discussion." *E.g.*, *Caddell Constr. Co. v. United States*, 125 Fed. Cl. 30, 45 (2016). Though agencies have considerable discretion in how to conduct discussions, that discretion does not permit an agency to mislead an offeror. *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 653 (2003). Here, plaintiff alleges that it revised its proposal and provided higher prices as a direct result of its discussions with the

Agency. Pl.'s MJAR at 13. In response, defendant correctly points out that the ENs did not require that DynCorp revise its prices, but rather only required that DynCorp "support the specific 'normalization factor' it used when basing its labor rates on ▌▌▌▌▌▌▌▌▌▌ data." Def.'s CMJAR at 26 (citing AR 71214). The Court concludes that while this might suggest misleading discussions occurred, the revision actually appears to be due to DynCorp's own misinterpretation of the EN. In fact, contrary to plaintiff's understanding, the Solicitation did not merely limit supporting documents for labor rates to historic wage rates and payrolls, but it actually allowed for the inclusion of labor surveys as well. AR 3831; *see also* Pl.'s MJAR at 14 (citing *Gentex*, 58 Fed. Cl. at 653 (2003)). This indicates that plaintiff misinterpreted the Solicitation's basic requirements. As a misinterpretation is distinctly different from misleading discussions, the Court concludes that the Agency did not engage in misleading discussions with DynCorp.

### C. Cost/Price

Next, plaintiff alleges that the Army violated both the RFP and FAR 15.404-1 when conducting its price reasonableness and cost realism analyses. *See generally* Pl.'s MJAR at 14–25. Relevantly, plaintiff argues the following: (1) the Army did not properly conduct a cost realism analysis; (2) the price reasonableness analysis did not comport with FAR 15.404-1(b)–(c); (3) the Army arbitrarily limited its price reasonableness evaluation to the lowest priced offeror in each COCOM. *See generally id.* at 14–25.

#### 1. Price Reasonableness

In addition to its cost realism arguments, plaintiff argues that the Agency's price reasonableness evaluation "was materially flawed." *See* Pl.'s MJAR at 14. In support of that argument, plaintiff asserts that the Agency "failed to employ any of the proposal analysis techniques set forth in FAR 15.404-1(b) and (c) to evaluate cost/price reasonableness," and that the Agency only evaluated "whether the lowest-price offeror's, not the awardee's, cost/price was reasonable for each [COCOM] region." Pl.'s MJAR at 14–15. For the reasons set forth below, the Court sustains most—but not all—of plaintiff's price reasonableness protest grounds.

The Agency employed FAR Part 15 evaluation methods in this procurement. AR 2629. Specifically, the Solicitation stated that the "Government will evaluate the realism of the offerors [sic] proposed cost for the cost reimbursable effort through cost realism analysis [in accordance with] FAR 15.404-1(d). The Government will evaluate price reasonableness for the fixed priced effort [in accordance with] FAR 15.404-1(b)." *Id.* As the Solicitation did not require the Agency to "evaluate cost/price reasonableness" in accordance with FAR 15.404-1(c),[4] which plaintiff argues the Agency failed to do, the Court denies that specific protest ground. *Compare* AR 2629–30, *with* Pl.'s MJAR at 15–18.

The Solicitation also established the following:

---

[4] The Court reiterates that the Agency elected to employ *certain* FAR Part 15 procurement evaluation methods for evaluating IDIQ contract awards, which, as a general matter, are governed by FAR Part 16.

10

>   To be considered for award, the total proposed [CPFF] for the [CPFF] CLINs (including any [Most Probable Costs] pursuant to (iv)(b) above[]), and the total proposed price for the [FFP] CLIN[s] must separately be found reasonable. A determination that either one is unreasonable will render the offeror ineligible for an award in that [COCOM] or Afghanistan.

AR 2630. In reviewing plaintiff's remaining claims, the Court interprets the Solicitation in a manner that "harmonizes and gives reasonable meaning to all of its provisions." *See Banknote Corp.*, 365 F.3d at 1353. As such, the Court concludes that, in addition to evaluating the realism of the CPFF efforts, the Agency also had to evaluate each offeror's CPFF and FFP CLINs separately for reasonableness in determining whether each offeror would be "considered for award." *See* AR 2630; *see also Banknote Corp.*, 365 F.3d at 1353. The following language from the SSDD supports this interpretation: "[o]f the *remaining eligible offerors*, the Government will make an award . . . to the responsible Offeror determined to provide the best value." AR 70613 (emphasis added).[5] Read together, the Agency clearly "considered for award" all "remaining eligible offerors" when determining each COCOM awardee, and, therefore, obligated itself to evaluate each of those offeror's price proposals for reasonableness. *See* AR 2630, 70613.

Plaintiff contends that the Agency failed to meaningfully evaluate offerors' Cost/Price proposals in accordance with the Solicitation's required evaluation scheme, as the Army merely "listed each offerors' FFP and CPFF pricing [] in descending order," and, "[w]ithout performing any other analysis," concluded that each awardee's prices were fair and reasonable. Pl.'s MJAR at 16. or a FAR 15.404-1(b)(2) analysis "to be meaningful," the Agency "must *compare* the prices of offerors to each other, or to the average price, or to the independent government cost estimate, or to the prices under other similar contracts, and must *explain* the reasons for any significant variations in prices." *Id.* at 15–16 (emphases in original) (citing *Technatomy Corp. v. United States*, 144 Fed. Cl. 388, 390 (2019)). Additionally, plaintiff alleges that the "wide disparity" in proposed prices should have informed the Agency that its reliance on "the mere existence of competition" was "insufficient to establish that an awardee's proposed prices are reasonable." *Id.* at 16–17 (citing *Serco, Inc. v. United States*, 81 Fed. Cl. 463, 494 (2008)); Pl.'s Reply at 7–8. Finally, plaintiff argues that the price reasonableness evaluations were flawed both "because [the Agency] only evaluated the reasonableness of the lowest-price offeror, rather than the awardee," and because the Administrative Record "lacks any evidence that either the cost/price evaluators or the SSA evaluated whether the awardee's proposed cost/price was unreasonably high per FAR 15.404-1(b) or (c)." *Id.* Plaintiff claims this is significant because the "SSA's Determinations reveal that in six out of seven of the [regions], the awardee's price is substantially higher than the lowest-price offeror," the implications of which are made worse by the absence of "*any* evaluation of whether the awardee's higher price is reasonable." *Id.* at 19–20 (emphasis in original).

In response, defendant contends that the Agency's price reasonableness evaluation comported with FAR 15.404-1(b) requirements, as "the Cost/Price Factor Chair determined that

---

[5]   It is not disputed that the Agency considered DynCorp an "eligible offeror." *See generally* AR 70609–34 (SSDD).

adequate price competition existed, such that the lowest total evaluated price [('TEP')] of each region was fair and reasonable, as were the lowest [FFP] and [CPFF] proposed price[s] for each [COCOM]." Def.'s CMJAR at 28. Defendant further argues that the CO "documented price-reasonableness determinations for each of the awardees" based on adequate price competition, and that the CO "found no basis to conclude that the awardee's [TEP] was unreasonable." *Id.* at 28–29. Defendant claims that, in addition to concluding that the awardees' TEPS were reasonable based on adequate price competition, the CO also performed a value analysis, ultimately finding that "the awardees' prices were reasonable based upon the value provided by their non-price proposals." *Id.* at 30–31. Finally, defendant alleges that "the [CO] necessarily relied upon the comparison of the offerors' proposals in the SSAC's Comparative Analysis Report and the [SSA's] decision document" in analyzing offerors and reaching those conclusions. *Id.* at 31 (citations omitted).

As a general matter, "[t]he contracting officer is responsible for evaluating the reasonableness of the offered prices." 48 C.F.R. § 15.404-1(a). Pursuant to FAR 15.404-1(b), an agency may utilize various price analysis techniques and procedures to determine price reasonableness. The "preferred techniques" include comparing offerors' proposed prices against each other or comparing offerors' proposed prices to the historical prices paid for similar items. § 15.404-1(b)(2)(i)–(ii), (b)(3). The Solicitation indicated the Agency's intent to employ adequate price competition to compare offerors' prices and establish that those prices were fair and reasonable. *See* § 15.404-1(b)(2)(i); *see also, e.g.*, AR 73825–26. FAR 15.403-1(c)(1)(i) dictates that adequate price competition exists when the following occurs: (1) "[t]wo or more responsible offerors, competing independently, submit priced offers that satisfy the Government's expressed requirement"; (2) "[a]ward will be made to the offeror whose proposal represents the best value (see 2.101) where price is a substantial factor in source selection"; and (3) "[t]here is no finding that the price of the otherwise successful offeror is unreasonable."

When executing one of the price analysis techniques enumerated in FAR 15.404-1(b)(2), agencies may also employ a value analysis. *See* 48 C.F.R. § 15.404-1(b)(4). If the agency elects to conduct a value analysis, as the Agency did here, FAR 15.404-1(b)(4) dictates the following: "[v]alue analysis can give insight into the relative worth of a product and the Government may use it ***in conjunction with*** the price analysis techniques listed in paragraph (b)(2) of this section." (emphasis added). Thus, as the Agency elected to conduct a value analysis as part of its price reasonableness evaluation, that value analysis should have been completed in conjunction with the Agency's determination that adequate price competition existed. *See id.* For the reasons set forth below, the Court concludes that the Agency failed to conduct its price reasonableness evaluations in accordance with the requirements set forth in the Solicitation, and that the Agency failed to conduct a proper value analysis in accordance with the FAR.

The Administrative Record contains several memoranda in which the Cost/Price Factor Chair found each awardee's prices to be reasonable based on adequate price competition, as well as determinations in each COCOM that the lowest proposed TEPs, FFP CLINs, and CPFF CLINs were fair and reasonable. *See generally* AR 69866–95. To document the existence of adequate price competition, the Cost/Price Factor Chair created three charts for each COCOM that listed each offeror in ascending order of price. *See, e.g.*, AR 69876–77 (CENTCOM). The first chart was based on the offeror's TEP, the second on the offeror's total FFP, and the third on

the offeror's total CPFF. *See, e.g.*, *id.* Each chart also included a finding, as a percentage, of every offeror's "Difference from Low." *See, e.g.*, *id.* Beneath each respective chart, the Cost/Price Factor Chair simply expressed that, based on a comparison of the TEP, FFP, or CPFF, the lowest-priced offeror's prices "appears fair and reasonable." *See, e.g.*, *id.*

The Cost/Price Factor Chair failed to evaluate the reasonableness of *each* offeror's CPFF and FFP CLINs in violation of the terms of the Solicitation, as the Cost/Price Factor Chair only evaluated the reasonableness of the lowest-priced offeror in each COCOM. *Compare, e.g.*, AR 2630, *with* AR 69876-77 (CENTCOM). This evaluation error is particularly egregious given that some offerors proposed prices 1,000–2,000% higher than those of the lowest-price offerors, and the CO never addressed those price differences. *See e.g.*, AR 69876. This lack of analysis is problematic, as price *consistency*, not inconsistency, demonstrates price reasonableness, and the Solicitation clearly required that the Agency separately evaluate each offeror's CPFF and FFP CLINs. *See, e.g.*, AR 2630; *see also, e.g.*, *Serco, Inc.*, 81 Fed. Cl. at 494. Thus, the Court concludes that both the Cost/Price Factor Chair's failure to conduct a complete price reasonableness assessment for offerors and the CO's ultimate reliance on that error violated the Solicitation and FAR 15.404-1(b).

While the Cost/Price Factor Chair's failure to comprehensively evaluate price reasonableness is not in itself a violation of either the Solicitation or the FAR, the CO's near-exclusive reliance on those flawed analyses in reaching her own price reasonableness determinations resulted in a violation of both. Like the Cost/Price Factor Chair, the CO failed to separately determine whether *each* offeror's CPFF and FFP CLINs were reasonable. *Compare, e.g.*, AR 2630, *with* AR 73825–26 (EUCOM). Instead, the CO performed combined price reasonableness assessments, as evidenced by the following statement from the CO's April 9, 2019 Fair and Reasonable Price Determination:

> Also, due to the inherent link of the [FFP] effort, Setting the Theater, which was also the guaranteed minimum obligation for each contract award, the cost-reimbursable efforts were considered with the [FFP] efforts. The awards for both the Setting the Theater and Performance Task Orders are inseparable for all award decisions with the exception of Afghanistan, which did not have an associated Setting the Theater Task Order.

AR 73825–26. In addition to those procedural evaluation errors, the substance of the CO's price reasonableness determinations proved to be equally flawed. The CO appeared to rely on the Cost/Price Factor Chair's incomplete price reasonableness assessments while evaluating prices, and she failed to include any meaningful analysis beyond a recitation of the percentage difference between each offeror and the "difference from low" and "difference from next low." *See generally* AR 73823–32. Such a bare comparison of percentage differentials, without further analysis, is an inadequate means of determining price reasonableness, particularly as the record lacks any evidence of comprehensive price reasonableness evaluations for the COCOM awardees' proposed prices. *See Technatomy Corp. v. United States*, 144 Fed. Cl. 388, 390 (2019) ("[The agency] conducted a meaningful price reasonableness analysis, in compliance with 48 C.F.R. § 15.404-1(b)(2), by comparing the prices of offerors to each other's, to the average price, to the independent government cost estimate, and to the prices under other contracts, *and*

*by explaining that variations were due to differing risk preferences and technical approaches*." (emphasis added)); *see also, e.g.*, AR 73829. Moreover, the Court concludes that, because the Army did not conduct a proper price reasonableness analysis in accordance with the Solicitation and the FAR, the Agency could not have accurately determined whether DynCorp's price was "unreasonably high." This is significant because, as more fully explained *supra*, even where price reasonableness is sufficiently analyzed, the Agency is still required to hold discussions with an offeror that proposed an "unreasonably high" price, as an "unreasonably high" price constitutes a "significant weakness." *See WorldTravelService v. United States*, 49 Fed. Cl. 431, 439 (2001), *see also DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 669 (2010).

Additionally, contrary to defendant's assertions that the CO relied upon the SSAC's Comparative Analysis Report and the SSDD's value analysis, the CO seemingly relied solely on the Cost/Price Factor Chair's flawed price reasonableness analyses in conducting her value analysis. *See generally, e.g.*, AR 73825–26 (EUCOM); *see also* Def.'s CMJAR at 30–31.[6] In fact, a deeper review of the record unearthed even greater flaws with the Agency's overall price evaluations. *See* Def.'s CMJAR at 30–31. In addition to the existing issues stemming from the CO's faulty reliance on incomplete price reasonableness assessments, the Court found that the Agency failed to meet the requirements set forth under FAR 15.404-1(b)(4). That failure is made evident by the CO's Determination of Fair and Reasonable Price memoranda in several COCOMs, in which she stated the following:

> The Cost/Price Factor Chair evaluated price reasonableness for the LOGCAP V EUCOM award decision. This evaluation resulted in a determination that Vectrus Systems Corporation's [TEP] is fair and reasonable based on competition. The Cost/Price Factor Chair also stated that other offerors may be able to be determined fair and reasonable based on a tradeoff with non-price factors. The value derived from the non-price factors renders the value of the cost-reimbursable prices for the performance task orders reasonable for the identified best[-]value award decisions in accordance with FAR 15.404-1(c) and (d).

*E.g.*, AR 73825 (EUCOM). This excerpt reveals that the CO failed to concurrently perform a value analysis and price competition determination as required by the FAR. *Compare* 48 C.F.R. § 15.404-1(b)(4), *with, e.g.*, AR 73825. FAR 15.404-1(b)(4) requires that the CO conduct a value analysis "in conjunction with" the selected price analysis technique. By failing to examine adequate price competition concurrently with the value analysis, the Agency failed to meet the requirements set forth under FAR 15.404-1(b)(4). As such, the Agency's price reasonableness

---

[6] The CO's Determination of Fair and Reasonable Price memoranda clearly demonstrate that the CO relied upon the Cost/Price Factor Chair's price reasonableness evaluations in conducting her value analysis. *See, e.g.* AR 73825–26 (EUCOM). A review of the Cost/Price Factor Chair's Determination of Price Reasonableness memoranda reveals that the Cost/Price Factor Chair neither mentioned nor included substantive discussions on the findings in the SSAC's Comparative Analysis Report or the SSDD. *See, e.g.*, AR 69879–82 (EUCOM). Therefore, even if the Court inferred that the CO relied upon the SSAC's Comparative Analysis Report and the SSDD in conducting a value analysis for each COCOM, the CO's value analysis was still flawed.

determinations, to the extent they exist at all, fall short of the requirements under both the FAR and the Solicitation.

### 2. Cost Realism

Plaintiff claims that the Army failed to rationally conduct a cost realism analysis in accordance with the FAR and the RFP. Pl.'s MJAR at 22. Pursuant to FAR 15.404-1(d)(1), a cost realism analysis is "the process of independently reviewing and evaluating specific elements of each offeror's proposed cost[s]" to determine whether those costs "are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal." For competitive fixed-price contracts, a cost realism analysis is not necessary unless the solicitation specifically calls for one. 48 C.F.R. § 15.404-1(d)(3). For cost-reimbursement contracts, however, a cost realism analysis is required "to determine the probable cost of performance for each offeror." § 15.404-1(d)(2). In performing a cost realism analysis, agencies have broad discretion regarding the "nature and extent" of the analysis "unless the agency commits itself to a particular methodology in a solicitation." *Mission1st Grp., Inc. v. United States*, 144 Fed. Cl. 200, 211 (2019) (quoting *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 358 (2009)). Here, the Solicitation stated that the Agency would evaluate the realism of offerors' cost reimbursable efforts in accordance with FAR 15.404-1(d). AR 2629.

When cost realism issues are raised in a bid protest, "the Court defers to those agency conclusions that are rational and based on reasoned judgment." *United Payors & United Providers Health Servs. v. United States*, 55 Fed. Cl. 323, 329 (2002). A rational cost realism analysis need not be conducted with "impeccable rigor," as the agency must only consider the information available and must not make "irrational assumptions or critical miscalculations." *E.g., OMV Med., Inc. v. United States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000). Thus, to prevail on a cost realism claim, the plaintiff must "demonstrate[] the absence of a rational basis for the agency's decision." *CSC Gov't Sols. LLC v. United States*, 129 Fed. Cl. 416, 429 (2016) (quoting *CTA Inc. v. United States*, 44 Fed. Cl. 684, 693 (1999) (citations omitted)).

In support of its cost realism arguments, plaintiff produced a chart to demonstrate the disparity in proposed labor hour estimates for NORTHCOM, reproduced as follows:

**Examples of the Wide Range of Hours (Productive and Direct Charged Non-Productive) Proposed for NORTHCOM**

| SITE | WBS | Site Code | DynCorp Proposed Hrs. | KBR Proposed Hrs. | Vectrus Proposed Hrs. | P2GLS Proposed Hrs. | Flour Proposed Hrs. | Range (Max-Min) |
|---|---|---|---|---|---|---|---|---|
| NORTHCOM | 04.01.00.00.00 | USA001 | | | | | | |
| NORTHCOM | 04.17.01.00.00 | USA001 | | | | | | |
| NORTHCOM | 05.01.01.00.00 | USA001 | | | | | | |
| NORTHCOM | 05.04.00.00.00 | USA001 | | | | | | |

Pl.'s MJAR at 23. Specifically, plaintiff highlights Task 5.01, which lists estimated labor hours that range from 87,267 to 225,000. *Id.* (citing AR 7815, 13847, 27101, 46269, 64834). Plaintiff claims that, due to these "stark differentials," the Army should have concluded that the

awardee's proposed prices "significantly understated" the number of hours necessary to perform the Solicitation's requirements. *Id.* Moreover, plaintiff contends that those disparities could not have been adequately analyzed or interpreted unless the Agency conducted a proper cost realism analysis. *Id.* at 24. In response, defendant alleges that the Agency did, in fact, conduct a proper cost analysis and cites to multiple instances throughout the record where the Agency allegedly documented its cost realism evaluations. Def.'s CMJAR at 36 (citing, *e.g.*, AR 69374–75, 69483–86, 69593–96, 69709–14, 69832–37). Defendant also contends that the broad discretion afforded to offerors in creating their LSMs necessarily resulted in a variety of staffing estimates, including the proposed number of hours necessary to meet the requirements. *See* AR 2616–17.

The Court agrees with defendant's understanding of the record. The Solicitation granted offerors a great deal of discretion in creating their LSMs. *See id.* As such, it is not implausible that offerors' proposals included unique approaches with noticeable differences in the various data points included therein. Moreover, the Administrative Record as a whole reflects that the Army conducted a lengthy cost realism analysis, which included an evaluation of whether proposed labor hours for certain tasks were too low. *See, e.g.*, AR 68288–90, 68297–98, 68393, 68398, 68449, 68452, 68504–05, 68525, 68582–83.

Plaintiff further contends that Fluor—the AFRICOM awardee—failed to include overtime in its pricing. Pl.'s MJAR at 25. Specifically, plaintiff alleges that Fluor failed to account for local overtime laws, and that, had Fluor accurately accounted for overtime hours, Fluor's price for AFRICOM would have been $8.2–14.5 million higher.[7] *Id.* Due to this error, plaintiff argues that any cost realism analysis of Fluor's AFRICOM proposal must necessarily be flawed. *Id.*

The Court does not agree with plaintiff's assertions. The record shows that Fluor provided an "affirmative statement that [it] understands and will fully comply with current host nation laws, including labor laws," and that "[a]ll costs proposed are consistent with current host nation laws." AR 3799, 21964. Moreover, as defendant points out, Fluor is the incumbent contractor for the AFRICOM region and presumably has a good understanding of the local labor laws. *See* Def.'s CMJAR at 40. Accordingly, the Court defers to the Agency's decision that such an "affirmative statement" warranted confidence in Fluor's Cost/Price proposal. The Court also finds that the Army rationally completed its cost realism analysis for AFRICOM, and that, even if Fluor had miscalculated its hours, the Agency should still be afforded its due deference, as such an error is not "critical miscalculation." *See, e.g.*, *OMV Med., Inc.*, 219 F.3d at 1344.

---

[7] DynCorp and Fluor relied upon consultant declarations in making their arguments. Neither declaration was previously approved by the Court on Motions to Supplement the Administrative Record. Generally, the Court will not consider materials outside the Administrative Record in determining the merits of a protest unless those materials are necessary for judicial review. *See, e.g.*, *Axiom Resource Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379–81 (Fed. Cir. 2009). Although defendant seemingly objected to the use of DynCorp's consultant in its Cross-Motion for Judgment on the Administrative Record, *see* Def.'s CMJAR at 39, no party filed a Motion to Strike. As such, the Court hereby incorporates both DynCorp and Fluor's consultant reports into the Administrative Record.

### D. Prejudice

Plaintiff alleges that it was prejudiced by the Agency's actions, arguing that "[b]ut for the [A]gency's errors in the evaluation, [DynCorp] stood a reasonable chance of award." Pl.'s MJAR at 36. Plaintiff contends that a "substantial chance" of award does not mean it "absolutely would have received a contract." Pl.'s MJAR at 37 (citing *CSE Constr. Co., Inc. v. United States*, 58 Fed. Cl. 230, 258–59 (2003)). In response, defendant argues that "in each of the six regions where an IDIQ contract could have been awarded based upon the best-value determination, DynCorp's total evaluated price was more than 30 percent higher than the awardee's price, and DynCorp's proposal was inferior to each awardee on the combined non-price factors." Def.'s Reply at 7. While defendant concedes that "DynCorp does not need to demonstrate that it definitely would have won a contract in the absence of the alleged errors," defendant maintains that "a 'reasonable possibility' of an award is not sufficient to establish prejudice." Def.'s Reply at 9 (citing *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1593 (Fed. Cir. 1996)).

As the Court has determined that the Agency failed to properly conduct a price reasonableness determination in accordance with both FAR 15.404-1 and the terms of the Solicitation, the Court next must determine whether such a violation prejudices the plaintiff. In determining whether prejudice exists, the Court applies a different test depending on whether the procurement violated a regulation, or the Agency arbitrarily and capriciously violated the terms of the Solicitation. *See Caddell Constr. Co. v. United States*, 125 Fed. Cl. 30, 50 (2016). Here, the Court looks to both tests as the Agency violated both the terms of the Solicitation and procurement regulations.

The Federal Circuit has held that, "[u]nder the APA standard . . . , 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Banknote Corp.*, 365 F.3d at 1351 (quoting *Impresa*, 238 F.3d at 1332). In a bid protest, this Court has previously held that "when an irrational or arbitrary and capricious agency action has occurred, prejudice is presumed." *Caddell Constr. Co.*, 125 Fed. Cl. at 50 (citing *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)). As the Court has already determined that the Agency's failure to conduct the price reasonableness evaluation required by the Solicitation was arbitrary and capricious, prejudice is presumed for that argument. *See id.*; *see also Textron, Inc.*, 74 Fed. Cl. at 283–84 ("If the court finds that the Government has acted arbitrarily and capriciously, the analysis stops at that finding. There should be no need to continue to prejudice, because a finding that the Government acted arbitrarily and capriciously necessarily invalidates the procurement.").

When a "violation of statute or regulation has occurred, there must be a separate showing of prejudice." *Caddell Constr. Co.*, 125 Fed. Cl. at 50 (citing *Centech*, 554 F.3d at 1037). To establish prejudice, a protestor must "show[]a 'substantial chance' that it would have received the award if the error was corrected." *Info. Scis. Corp. v. United States*, 73 Fed. Cl. 70, 93 (2006) (citing *Bannum,* 404 F.3d at 1358). In *Textron*, this Court explained that, "[s]ince 1990, the substantial-chance requirement has been construed as requiring everything from a greater

than insubstantial chance of success on the merits, to a reasonable likelihood of receiving the award but for the alleged error, to allowing only protest by the second lowest bidder." 74 Fed. Cl. at 283–84 (citations omitted). Since *Textron* was issued, the inconsistent application of the "substantial chance" standard has yet to be remedied. While the Court will not attempt to remedy it now, based on the nature of the violation in this case, the Court employs the approach advanced in *Textron*, which assesses "whether the procurement violation was significant to the protestor's chance of being awarded the contract." 74 Fed. Cl. at 329.

Here, the Agency's failure to conduct an adequate price reasonableness evaluation and a proper value analysis in accordance with FAR 15.404-1(b) and FAR 15.404-1(b)(4), respectively, was necessarily "significant to the protestor's chance of being awarded the contract" given that the Agency based its award decisions on those flawed analyses. *See id*. While the Court finds that the Agency did not perform a price reasonableness analysis in accordance with FAR 15.404-1, even if the Court was to accept defendant's argument that the Agency conducted price reasonableness evaluations, such flawed evaluations were only conducted for the lowest priced offeror in each COCOM. *See* AR 73823–24, 70615, 70620, 70623, 70626, 70630–31, 70677; *see also* AR 73825–26, 73829–30. This failure directly affects plaintiff's chance of being awarded certain contracts given the Agency's sequential award scheme and failure to conduct a complete price reasonableness determination for the awardee in several COCOM regions. AR 2624–25.

As the Army failed to conduct an adequate price reasonableness evaluation and a proper value analysis in accordance with the Solicitation, FAR 15.404-1(b), and FAR 15.404-1(b)(4), the Agency's determination that DynCorp's prices were not unreasonably high is necessarily flawed. Only completion of a proper price reasonableness analysis for all offerors, including a determination of whether DynCorp's prices were unreasonably high, could inform the Court of whether DynCorp was next in line for an award. While the Court will not speculate as to the outcome of such an analysis, the Court believes that the Agency could have made different award decisions had it completed price reasonableness analyses along with concurrent value analyses. In evaluating cost and price, the Agency's action—or more accurately, inaction—was clearly "significant to the protestor's chance of being awarded the contract." See *Textron*, 74 Fed. Cl. at 329. That flawed analysis, standing alone, sufficiently demonstrates that plaintiff—as well as all other offerors—was prejudiced by the Agency's violations of FAR 15.404-1(b).

### IV.  Corrective Action

For the reasons set forth above, plaintiff demonstrated success on the merits. Consistent with discussions held during a December 3, 2019 status conference, the Army filed a status report on December 9, 2019, notifying the Court of its intention to take corrective action with respect to the Army's price reasonableness determinations. *See generally* Defendant's Status Report Regarding Corrective Action and Motion to Stay Proceedings. On December 17, 2019, the Court issued an Order staying and remanding the case to the Agency for a period of forty-five days—up to and including January 31, 2020—for the Agency to conduct corrective action. Order Remanding Case to Army. In that Order, the Court also directed the defendant to file a status report on or before February 7, 2020, "apprising this Court of the results of the

Agency's corrective action and providing the Court with the Agency's new price reasonableness determinations." *Id.* at 2.

On February 5, 2020, defendant filed a status report regarding the Agency's corrective action along with over 1,000 pages of supporting documentation. *See* Defendant's Status Report Regarding Corrective Action; *see also* Associated Documents. For the reasons enumerated in the Court's forthcoming Opinion and Order on Corrective Action, the Court finds that, on corrective action, the Agency adequately evaluated price reasonableness in accordance with the Solicitation and the FAR. As such, the Court need not address the parties' injunctive relief arguments. Additionally, as the Agency adequately evaluated price reasonableness through corrective action, defendant is now entitled to judgment in its favor.

## V. Conclusion

For the reasons set forth above, plaintiff's MOTION for Judgment on the Administrative Record is **GRANTED** in part and **DENIED** in part. Defendant and defendant-intervenors' CROSS-MOTIONS for Judgment on the Administrative Record are **GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge